

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

**ENTERED**
**09/30/2010**

| | | |
|---|---|---|
| In re: | § | |
| | § | Case No. 09-36569-H4-7 |
| JACK KLINE CO., INC., d/b/a | § | |
| TROJAN TOO MANUFACTURING | § | Chapter 7 |
| | § | |
| Debtor. | § | |
| | § | |
| | § | |

## MEMORANDUM OPINION ON TRUSTEE'S SECOND AMENDED MOTION TO SURCHARGE CENTRAL BANK AND OBJECTION TO CLAIM NO. 8
[Docket No. 116]

### I. INTRODUCTION

The Court writes this Memorandum Opinion to underscore the following points: (1) Chapter 7 trustees deserve compensation not only for both liquidating assets to pay unsecured claims but also for selling assets that result in payment of secured claims; (2) secured creditors must file an application pursuant to Federal Rule of Bankruptcy Procedure 2016 and 11 U.S.C. § 506(b) to obtain approval to collect their post-petition attorneys' fees and costs, and their failure to do so may merit disgorgement of amounts that they have collected;[1] and (3) secured creditors also must file an application pursuant to § 506(b) to collect post-petition interest at the default rate,[2] and their failure to do so may also merit disgorgement of interest that they have collected.

---

[1] Reference to a "Bankruptcy Rule" refers to the Federal Rules of Bankruptcy Procedure. Any reference herein to "the Code" refers to the United States Bankruptcy Code. Further, reference to any section (i.e. §) refers to a section in 11 U.S.C., which is the United States Bankruptcy Code. Reference to a "Rule" refers to the Federal Rules of Civil Procedure.

[2] Central Bank's attorney stipulated through judicial admission that "post-maturity" and "default" rate of interest have the same meaning. [Doc. Nos. 76, 108, 111 & 115]. "A judicial admission is a formal concession in the pleadings or stipulations by a party or counsel that is binding on the party making them." *Martinez v. Bally's La., Inc.*, 244 F.3d 474, 476 (5th Cir. 2001). In pleadings that he filed, Central Bank's attorney repeatedly used the term "default interest rate" followed by the term, "post-maturity rate," in parenthesis. [Doc. No. 76, p. 9]. Central Bank's attorney also repeatedly used the term "post-maturity" followed by the term, "default," in parenthesis. [Doc. Nos.

The Court makes the following findings of fact and conclusions of law pursuant to Federal Rules of Bankruptcy Procedure 9014 and 7052. To the extent that any finding of fact is construed as a conclusion of law, it is adopted as such. Moreover, to the extent that any conclusion of law is construed as a finding of fact, it is adopted as such. The Court reserves its right to make additional findings of fact and conclusions of law as it deems appropriate or as may be requested by any of the parties.

## II. FINDINGS OF FACT

1. On September 1, 2009 (the Petition Date), Jack Kline Company, Inc. (the Debtor) filed its voluntary Chapter 7 petition. [Doc. No. 1]. As of the petition date, the estate created by this filing (the Estate) had assets that could be sold to pay claims.

2. On October 2, 2009, Rodney Tow, the Chapter 7 trustee (the Trustee), filed an Application to Employ Amanda Enriquez, Agent of Keller Williams Realty as Real Estate Agent and Request for Authorization to Pay Commission at Closing (the Application). [Doc. No. 13]. The Application states that the normal commission for this type of sale is six percent, and that Amanda Enriquez (the Realtor) should be compensated based on the sales price of the Estate's interest. [Doc. No. 13, p. 3]. The Trustee sought to employ the Realtor because the Trustee was attempting to sell certain properties owned by the Estate located at 910 Curtin Avenue and 912 Curtin Avenue (the Property) to Sandra L. White and Kenneth J. Welsh for the amount of $500,000.00. [Doc. No. 65, p. 3]. According to the Trustee, the costs and expenses associated with the sale of the Property included the Trustee's fees, certain attorneys' fees, the real estate

---

108, p. 4, & 111, p. 3–4]. By using one term and immediately following it with another term in parenthesis, Central Bank's attorney stipulated through judicial admission that "default" and "post-maturity" interest rates have the same meaning. His disingenuous attempt in open court to deny that the two phrases have the same meaning must necessarily fail.

commission, the annual assessment, title insurance, and property taxes.[3] [June 8, 2010 Tr. 70:16–71:24]. The Trustee testified that all of the costs and expenses were reasonable and necessary. [June 10, 2010 Tr. 85:3–7].

3. On October 9, 2009, Doc's Trading Post, LLC (Doc's) filed a Response and Objection to the Application. [Doc. No. 17].

4. On October 19, 2009, the Court issued an Order Authorizing Employment of Tow & Koenig, PLLC as General Counsel.[4] The Order further states that compensation is to be paid in such amounts as may be allowed by the Court upon proper application. [Doc. No. 22].

5. On November 17, 2009, the Court granted the Trustee's Motion to Withdraw the Application. [Doc. No. 37].

6. On December 8, 2009, the Trustee filed a Notice of Assets & Requests for Notice to Creditors Proofs of Claims due by March 8, 2010. [Doc. No. 42].

7. On December 9, 2009, the Trustee filed his Second Application to Employ Amanda Enriquez, Agent of Keller Williams Realty as Real Estate Agent (the Second Application). [Doc. No. 44].

8. On December 9, 2009, the Trustee filed his Motion to Sell Property Free and Clear of all Liens, Claims and Encumbrances (the Motion), plus the proposed order granting this motion. [Doc. No. 45]. Paragraph 27 states that the total per diem post-petition interest

---

[3] The expenses that the Trustee asserts were incurred by the Estate are as follows: Trustee fees under § 326(a) (the Trustee asserts that he is entitled to the maximum amount of $28,250.00), attorneys' fees incurred by the Trustee for services rendered by the law firm that he retained ($2,615.85), the real estate commission ($30,000.00), the annual assessment ($634.07), title insurance ($2,979.00), property taxes ($13,424.79), and other additional taxes ($2,071.91), totaling $77,903.71.[Trustee's Ex. No. II].

[4] The Trustee himself is a name partner at the law firm of Tow & Koenig, PLLC (the Trustee's Law Firm). The other name partner is Julie Koenig.

3

rate for both loans to be charged by Central Bank is $29.00. [Doc. No. 45, p. 7 ¶ 27]. Neither the Trustee nor any other party in interest disputes that Central Bank had a properly perfected lien on the Property as of the Petition Date and therefore is a secured creditor in this case. Nor does any part dispute that Central Bank has a first lien on the Property that is superior to the lien of any other party who has a lien on the Property.

9.  On December 29, 2009, Doc's filed a Response and Objection to the Motion [Doc. No. 50].

10. On January 11, 2010, the Court entered an Order granting the Second Application. The Order authorized the Debtor to pay a real estate commission of six percent to the Realtor. [Doc. No. 54].

11. On January 27, 2010, the Trustee and SAFT America (Saft) filed a Stipulation as to the Subordination Agreement and Estate, wherein SAFT agreed to subordinate its lien on the Property to the Estate in exchange for the payment of $16,000.00 from the proceeds of the Property's sale, and to transfer its lien to the Estate pursuant to 11 U.S.C. § 510(c)(2). [Doc. No. 57].

12. On January 28, 2010, the Internal Revenue Service (the IRS), a secured creditor in this case, filed its Consent by Internal Revenue Service to the Motion. [Doc. No. 60].  In filing this pleading, the Trustee was representing that the IRS consented to the sale of the Property.

13. On January 28, 2010, Harris County, a secured creditor in this case, filed its Consent by Harris County to the Motion. [Doc. No. 61]. In filing this pleading, the Trustee was representing that Harris County consented to the sale of the Property.

4

14. On January 28, 2010, Trades Publishing, Inc., a secured creditor in this case, filed its Consent to the Motion. [Doc. No. 62]. In filing this pleading, the Trustee was representing that Trades Publishing, Inc. consented to the sale of the Property.

15. On January 29, 2010, this Court issued an Order on the Motion (the Sale Order) authorizing the Trustee to sell the Property. The Property was: (1) to be sold free and clear of all liens, claims and encumbrances; (2) any liens on the Property were to attach to the proceeds of the sale; and (3) the Trustee was authorized to pay closing costs, taxes and the real estate commission of six percent of the gross sales price at closing. Moreover, the Court authorized the Trustee to pay Central Bank's lien at closing. [Doc. No. 65]. Specifically, the language in the Sale Order reads as follows: "it is further, **Ordered** that the Trustee is authorized to pay the following lien at closing: Central Bank." [Doc. No. 65, p. 3].

16. On February 15, 2010, the Trustee, Sandra White and Kenneth Welsh entered into an agreement to sell the Property, and a settlement statement (the Statement) was produced, reflecting a $500,000.00 contract sales price. [Trustee's Ex. B]. The Statement included a payoff to Central Bank in the amount of $249,067.79; this figure included post-petition accrued, unpaid interest at the default rate and post-petition attorneys' fees incurred by Central Bank. [Trustee's Ex. B]. The Statement also included commissions to be paid to Prudential Gary Greene, Keller Williams Realty, Chuck Bradley, and Amanda Enriquez in the amounts of $7,485.00, $4,857.00, $7,515.00, and $10,143.00, respectively (totaling $30,000.00 in real estate commissions). [Trustee's Ex. B]. The title company, Veritas Title Partners, L.P. (Veritas Title), was to distribute the sale proceeds. [Trustee's Ex. B]. And, in fact, closing took place and Veritas Title distributed proceeds pursuant to the

5

Statement, with Central Bank receiving the amount of $249,067.79. [Trustee's Ex. B]. The amount received by Central Bank included post-petition accrued, unpaid interest at the default rate and post-petition attorneys' fees incurred by Central Bank.

17. On March 4, 2010, the Trustee filed his Motion to Authorize Distribution to Secured Creditors, requesting the Court to authorize him to disburse $9,958.45 to the IRS, $3,772.81 to NM Energy of Texas, $19,727.64 to the Internal Revenue Service, and $16,000 to SAFT as payment in full. [Doc. No. 69].

18. On March 5, 2010, the Trustee filed his Application for Compensation and Reimbursement of Expenses for Tow & Koenig, PLLC, Trustee's Attorney (the Fee Application). [Doc. No. 70]. The Trustee requested fees of $29,547.45, together with reimbursement of out of pocket expenses in the amount of $859.52, totaling $30,406.97. [Doc. No. 70, p. 1].

19. On March 5, 2010, the Trustee also filed his Notice of Filing of Attorney's First Application for Payment of Fees for Tow & Koenig, PLLC in the amount of $30,406.97. [Doc. No. 71].

20. Additionally, on March 5, 2010, the Trustee filed a Motion to Surcharge Central Bank Pursuant to 11 U.S.C. §506(c) in the amount of $38,806.61 to recover costs associated with the sale of the Property (the Motion to Surcharge). [Doc. No. 74]. The Trustee sought to assess a surcharge against Central Bank for its pro-rata share (here, 46.72%) of the expenses associated with the reasonable and necessary costs and expenses of preserving and disposing of the Property.[5] [Doc. No. 74, p. 2]. The pro rata share is a

---

[5] The sales price of the Property was $500,000.00. The payoff to Central Bank, subtracting the $13,596.62 in accrued post-petition interest at the default rate and the $1,850.00 in post-petition attorneys' fees, is $233,621.17 (as

proportion of recovery from the sale proceeds. [Doc. No. 74, p. 2–3]. Other creditors with junior liens on the Property (already mentioned in Findings of Fact Nos. 11–14) gave conditional consents to the surcharge (*i.e.*, they consented to the surcharge as to them so long as Central Bank was surcharged). [Trustee's Ex. F].

21. On March 16, 2010, Central Bank filed its Response and Objection to the Motion to Surcharge (Central Bank's Response). [Doc. No. 76]. Central Bank objected to the Motion to Surcharge, asserting that  that: (a) the amount sought was neither necessary, reasonable, nor beneficial to Central Bank; (b) the requested surcharge violated the priority system of Chapter 5 of the Bankruptcy Code; (c) the amount paid to Central Bank is no longer property of the Estate and subject to surcharge; and (d) because there was never any equity for the Estate in the Property, the Trustee violated 11 U.S.C. §363(f) in even proposing and then consummating the sale.[6] [Doc. No. 76, p.1].

22. On March 25, 2010, Central Bank filed its Objection to the Fee Application (the Objection). [Doc. No. 83]. In the Objection, Central Bank asserted that: (a) the services generating the fees listed in the Fee Application did not benefit the Estate; (b) the amounts incurred and expended were neither necessary nor reasonable; and (c) the amounts were excessive in light of 11 U.S.C. 363(f), the outcome of the sale, and lack of appreciable benefit to the Estate. [Doc. No. 83, p. 3]. Further, the Objection asserted that the hourly rate charged by Tow & Koenig PLLC for representing the Trustee was excessive. [Doc. No. 83, p. 4].

---

explained *infra*). As such, Central Bank's pro-rata share of the surcharge is 46.72%. (*i.e.*, $233,621.17/$500,000 = .4672)

[6] Central Bank readily admits that it could have foreclosed on the Property and completely satisfied its lien. [Docket No. 76 ¶ 20].

23. On March 25, 2010, Doc's filed an Objection to the Fee Application, asserting that the sale of the Property was marginally beneficial to the Estate's unsecured creditors and much more beneficial to the Trustee and the Trustee's Law Firm. [Doc. No. 85].

24. On April 1, 2010, the Trustee filed his First Amended Motion to Surcharge Central Bank pursuant to 11 U.S.C. §506(c) and Objection to Claim No. 8 (the Amended Motion to Surcharge). [Doc. No. 88]. In this amended motion, the Trustee argues that this Court should not allow Central Bank to recover post-petition interest at the default rate. [Doc. No. 88, p. 10].

25. On April 8, 2010, Central Bank filed a Motion for Summary Judgment with respect to the First Amended Motion to Surcharge (the Summary Judgment Motion). [Doc. No. 108].

26. On April 9, 2010, Central Bank filed its Objection and Motion to Dismiss the Trustee's Objection to Claim No. 8 (the Motion to Dismiss). [Doc. No. 111]. Central Bank asserts that this Court lacks jurisdiction because Central Bank's allowed secured claim has already been paid (through distribution of the sale proceeds by Veritas Title). [Doc. No. 111, p.2]. In the alternative, Central Bank asserts that even if this Court does have jurisdiction, Central Bank is entitled to post-petition interest at the default rate.[7] [Doc. No. 111, p.3].

27. On April 20, 2010, the Trustee filed a Response to the Summary Judgment Motion in which he argues that the Court has jurisdiction to reconsider the Sale Order pursuant to Rule 60(b) as incorporated through Bankruptcy Rule P. 9024. [Doc. No. 114].

---

[7] In fact, Central Bank's lien was paid off in full—including post-petition interest at the default rate, as well as post-petition attorneys' fees—from the proceeds generated from the sale of the Property. [Trustee's Ex. B]. For reasons discussed herein, the Court has decided that the amount of Central Bank's lien should not include any post-petition interest at the default rate or any post-petition fees. Central Bank will be allowed to receive post-petition interest at the non-default rate, as the Trustee has no objection to such payment.

28. On April 22, 2010, the Trustee filed his Response to the Motion to Dismiss (the Response to the Motion to Dismiss). [Doc. No. 115]. The Response to the Motion to Dismiss asserts the following: (1) Central Bank only repeated its summary judgment argument regarding the claim objection; and (2) Central Bank incorrectly asserts that it was owed post-petition interest at the default rate. [Doc. No. 115].

29. On April 22, 2010, the Trustee filed a Second Amended Motion to Surcharge Central Bank Pursuant to 11 U.S.C. § 506(c) and Objection to Claim No. 8, clarifying the claim objection and surcharge motions (the Second Amended Motion to Surcharge).[8] [Doc. No. 116]. The Second Amended Motion to Surcharge is the "live" pleading, superseding the First Amended Motion to Surcharge and the Motion to Surcharge.

30. On April 22, 2010, the Trustee filed the Trustee's Motion to Convert Contested Matters to Adversary Proceedings (the  Motion to Convert). [Doc. No. 118]. Subsequently, on May 6, 2010, Central Bank objected. [Doc. No. 131]. Central Bank objected prior to this Court trying the Second Amended Motion to Surcharge as a contested matter on May 26, 2010. [Doc. No. 116].

31. The Court has decided to grant the Motion to Convert.[9]  Accordingly, to the extent that the Trustee has requested any relief from Central Bank that would require the filing of an adversary proceeding—for example, equitable subordination of Central Bank's claim—the Court will treat the dispute as if it was an adversary proceeding.

---

[8] In the clarification section, the Trustee clarifies that he is seeking reconsideration of Central Bank's claim in whole or in part so that unsecured creditors would not have to bear the burden of expenses incurred in recovering the surcharge amount and prosecuting the claim objection. [Doc. No. 116, p. 2]. The Trustee requests the Court to surcharge Central Bank's proportionate share of the expenses to dispose of the Property in the amount of $38,806.61 and to disallow Central Bank's claim to the extent that this claim includes post-petition interest charged at the default rate. [Doc. No. 116, p.2].

[9] The actual order granting the Motion to Convert was entered on the docket September 30, 2010.

32. On May 18, 2010, Central Bank filed a Supplemental Objection to the Second Amended Motion to Surcharge (the Supplement) [Doc. No. 137]. The only additional argument made over and above arguments already asserted in Central Bank's Response is this: Central Bank is entitled to its attorneys' fees for prosecuting the Objection in the amount of $9,000.00 through the end of April, 2010, and an anticipated total of $15,000 in attorneys' fees through the conclusion of any hearings on the Objection. [Doc. No. 137].

33. On May 25, 2010, the Court entered an Order Denying Central Bank's Motion for Summary Judgment on the Trustee's Motion to Surcharge Central Bank. [Doc. No. 142].

34. On May 26, 2010, the Court held a hearing at which both Stephen Sakonchick, II (Sakonchick)—who is Central Bank's attorney—and the Trustee were present. [Tape Recording, 5/26/2010 Trial at 2:58:30 p.m.]. At the hearing, counsel gave oral arguments and the Court ruled that the Second Amended Motion to Surcharge would be treated as an untimely Rule 59(e) motion to amend because the Second Amended Motion to Surcharge requests the Court to amend the Sale Order rather than to deny Central Bank compensation altogether. The Court then noted that it would treat the Rule 59(e) motion as a Rule 60(b) motion. [Tape Recording, 5/26/2010 Trial at 3:01:42 p.m.]. After making this ruling, the Court then scheduled a hearing to begin on June 7 so that all counsel would have sufficient time to prepare for a hearing where the Trustee would have the burden of proving that circumstances exist under Rule 60(b) to obtain the relief requested.

35. A major point of contention between the Trustee and Central Bank is that the Trustee asserts that Central Bank represented to the Trustee that its post-petition interest was to be calculated at the non-default rate. The Trustee bases his assertion on information

10

provided to him by counsel for Central Bank, Sakonchick, in an email dated November 11, 2009. [Trustee's Exs. C & P]. Specifically, this email set forth the amount owed to Central Bank, and the interest figures shown in this email were calculated based upon the non-default rates set forth in the two promissory notes held by Central Bank. The Trustee relied upon these figures at all times thereafter.

36. Specifically, on November 11, 2009, Sakonchick sent an email to the Trustee which stated that the payoff, as of November 11, 2009, was $108,682.27 ($12.6104 per diem) for loan #70116950 and $117,365.51 ($16.7327 per diem) for loan #70118350, and that attorneys' fees were approximately $750.00. [Trustee's Exs. C, G & P]. There is no question that these payoff figures used the non-default rate of interest. For his part, Sakonchick, on behalf of Central Bank, argues that he sent an email on February 5, 2010 to the Trustee which contained revised payoff figures (entitled "Revised Payoff for Jack Kline Company Loan"), and that these payoff figures included interest calculated at the default rate. [Trustee's Ex. G]. The Trustee's response, which was part of his testimony, was that he did not open or read the February 5, 2010 email nor did he review Central Bank's Proof of Claim (which was filed on January 18, 2010) because he relied on Central Bank's representation made in the November 11, 2009 email.[10] [June 8, 2010 Tr. 62:1–8; 64:8–13]; [Trustee's Ex. G]. The Trustee testified that he did not focus on this email or the Proof of Claim because he administers between five hundred and one thousand Chapter 7 cases per year and, in his mind, Central Bank had already represented

---

[10] In its Proof of Claim, which was filed on January 18, 2010, on an attachment, Central Bank expressly sets forth the per diem interest amount for each of the two notes that it holds. Although Central Bank does not expressly state that these per diem amounts are calculated using the default rate of interest (indeed, there is no reference to the default rate of interest for either note), if the Trustee had actually looked at these two amounts and done the calculations himself, he would have discerned that Central Bank was calculating its payoff on each of the notes using the default rate of interest.

to him in the November 11 email that its payoff was based on the non-default rate of interest—and therefore, there was no need for him to review any further documents. [June 7, 2010 Tr. 46:16–18]. As the Trustee testified at trial: "I usually do not have the kind of problems with secured creditors in a case that I have had in this case. I cannot remember ever having a creditor affirmatively represent something to me and then, without telling me, change their position. I'm stunned by that." [June 7, 2010 Tr. 75:14–18].

37. On June 7, 2010 (continuing the hearing from May 26, 2010), the Court admitted Trustee's Exhibits L and M into evidence in order to show the default rate under the promissory notes for each of loan #0116950 and loan #70118350. [June 7, 2010 Tr. 10:21–22]; [Trustee's Exs. L and M]. Bradley Baird (Baird), the Vice President of Central Bank, testified that pre-petition, the Debtor was in default under the promissory notes, but that Central Bank never charged interest at the default rate prior to the Debtor's bankruptcy filing. [June 9, 2010 Tr. 66:16–23].

38. On June 9, 2010 (continuing the hearing from June 7, 2010), Baird testified that Central Bank's intent of charging post-petition interest at the default rate was never explicitly stated in any of the Criticized Asset Status Reports. [June 9, 2010 Tr. 56:12–20]; [Trustee's Exs. J, N, and O]. Baird also noted that the loan was "not considered to have loss exposure" in its June 30, 2009 Criticized Asset Status Report, a mere two months before the Debtor filed its Chapter 7 petition.[11] [June 9, 2010 Tr. 54:18–22]; Trustee's Ex. O]. Moreover, Baird testified at hearing that after June 2009, the Debtor stopped

---

[11] Central Bank did not believe it had a risk of loss with the loans. [Trustee's Ex. O].

12

communicating with Central Bank and never gave an early warning that the Debtor was planning bankruptcy. [June 21, 2010 Tr. 37:10–24].

39. Both loans 70116950 and 70118350 authorized a post-maturity (*i.e.*, default) rate of interest of 18% per annum. [June 21, 2010 Tr. 38:22–39:5]. [Trustee's Exs. L, M; Bank's Ex. C-3]. The non-default rate of interest on the Petition Date was 4.25% on loan 70116950 and 5.25% on loan 70118350, respectfully. [June 9, 2010 Tr. 84:19–85:2]; [June 8, 2010 Tr. 16:13–15]. The respective per diem interest amount charged at the non-default rate was $12.6104 on loan 70116950, and $16.7327 on loan 70118350. [Trustee's Ex. P]. Central Bank collected post-petition interest at the default rate of 18% from the proceeds of the sale of the Property, which amounted to per diem charges of $53.40 on loan 70116950 and $57.36 on loan 70118350, respectfully. [Trustee's Ex. DD]. The spread between default and non-default interest rates on loan 70116950 is 13.75%, which amounts to a per diem difference of $40.7896; loan 70118350 has a spread of 12.75%, which amounts to a per diem difference of $40.6273. The total per diem spread amounts to $81.4169. The Court finds that the spread between default and non-default interest rates on both loans is significantly large.

40. The Court finds that Central Bank did not charge the Debtor pre-petition interest at the default rate when it was authorized to do so by the loan documents. [June 21, 2010 Tr. 58:25–59:3]

41. The Trustee's testimony and the exhibits admitted into evidence show, even in their most conservative of estimates, that general unsecured creditors will receive no distribution and that priority unsecured creditors will not be paid in full as a result of Central Bank's

decision to charge and collect (at closing) post-petition interest at the default rate. [June 7, 2010 Tr. 58:1–15]; [Trustee's Ex. D].

42. Central Bank asserts that it is an over-secured creditor; the Trustee acknowledges that Central Bank is an over-secured creditor, and the sale of Property shows that Central Bank's claim was over-secured by over $250,000.00. [June 9, 2010 Tr. 65:23–66:1]; [June 21, 2010 Tr. 82:23–83:3].

43. Central Bank assisted the Trustee in pursuing the sale of the Property and encouraged it to be done. [Trustee's Ex. K]. Indeed, Sakonchick was in steady contact with the Trustee beginning at least on October 13, 2009 regarding the sale. [Trustee's Ex. K]. Sakonchick explicitly stated in his October 13, 2009 email that "I understand there is a pending sale of Central Bank's collateral (subject to bankruptcy court approval). However, I understand there is an issue with multiple abstracts of judgment. How can I help?" [Trustee's Ex. K]. After the Debtor filed for bankruptcy, Central Bank never indicated to this Court that it was concerned its debt would not be repaid.

44. Central Bank never filed any application pursuant to Bankruptcy Rule 2016 or a corresponding § 506(b) application. Instead, once the closing on the Property took place, Central Bank simply collected its post-petition attorneys' fees and interest at the default rate from the proceeds distributed by Veritas Title. As such, Central Bank charged the Estate post-petition fees and post-petition interest at the default rate without this Court's approval. Given that Central Bank had a first lien on the Property and that there was substantial equity in the Property as to Central Bank, the Court finds that Central Bank was never at any risk of not having its debt paid in full by the Estate. Moreover, because Central Bank never filed an application under 11 U.S.C. § 506(b) and Bankruptcy Rule

2016 to obtain this Court's approval to collect its post-petition fees and post-petition interest at the default rate, this Court finds that, prior to the entry of the Sale Order on the docket (*i.e.*, January 29, 2010) the Trustee was prevented from fairly and fully presenting his case to this Court that Central Bank was not entitled to collect the amount of fees and interest that it did, in fact, collect from the Estate when Veritas Title distributed proceeds to Central Bank at closing from the sale of the Property.

45. Both parties have amply discussed post-petition attorneys' fees and post-petition interest in their pleadings and at oral argument. [Trustee's Ex. BB, Bank's Ex. C-3]; [Doc. No. 76, 116, 137]; *see generally* [June 21, 2010 Tr.]. Central Bank has already collected $1,850.00 in post-petition attorneys' fees from the Estate, as well as post-petition interest at the default rate. Central Bank collected these sums when Veritas Title distributed proceeds to Central Bank at closing from the sale of the Property. [Trustee's Ex. DD].

46. None of the documents in its files produced by Central Bank during document production reflected that Central Bank ever charged post-petition interest at the default rate.

### III. CREDIBILITY OF WITNESSES

At the trial held on June 7, 8, 9, and 21, 2010, this Court heard testimony from Rodney Tow, the Chapter 7 Trustee, and Bradley Baird, the Vice President of Central Bank. The Court finds that both of these witnesses were credible.

### IV. CONCLUSIONS OF LAW

#### A. Jurisdiction and Venue

The Court has jurisdiction over this dispute pursuant to 28 U.S.C. §§ 1334(b) and 157(a). This contested matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (B), (N), (O), and the general "catch-all" language of 28 U.S.C. § 157(b)(2). *See In re Southmark Corp.*, 163

F.3d 925, 930 (5th Cir. 1999) ("[A] proceeding is core under section 157 if it invokes a substantive right provided by title 11 or if it is a proceeding that, by its nature, could arise only in the context of a bankruptcy case."); *De Montaigu v. Ginther (In re Ginther Trusts)*, Adv. No. 06-3556, 2006 WL 3805670, at *19 (Bankr. S.D. Tex. Dec. 22, 2006) (holding that a matter may constitute a core proceeding under 28 U.S.C. § 157(b)(2) "even though the laundry list of core proceedings under § 157(b)(2) does not specifically name this particular circumstance").

Central Bank asserts that this Court has no jurisdiction because Central Bank has already been paid money from the sale of the Property. Normally, these circumstances would preclude this Court from having jurisdiction because, once assets are transferred out of the bankruptcy estate, they are no longer "property securing an allowed secured claim," and, therefore, may not be surcharged under § 506(c). *In re Skuna River Lumber, LLC*, 564 F.3d 353, 355 (5th Cir. 2009). Here, however, *Skuna* is inapplicable because the facts in *Skuna* are distinguishable from those in the case at bar. In *Skuna*, the creditor who was surcharged had acted appropriately in every respect. However, in the case at bar, as explained *infra*, Central Bank committed misconduct prior to the sale of the Property. Thus, because of Central Bank's misconduct, amendment of the Sale Order (so that the transferred funds are subject to surcharge even after actually being disbursed) is appropriate pursuant to Rule 60(b). Stated differently, the amendment of the Sale Order allows this Court to retain jurisdiction. *See Nat'l Benevolent Ass'n of the Christian Church v. Weil, Gotshal & Manges, LLP (In re Nat'l Benevolent Ass'n of the Christian Church)*, 333 Fed. App'x 822, 826 (5th Cir. 2009) (noting that even a final decree closing a case after full administration does not deprive a court from enforcing or interpreting its own orders) (quoting *Stone v. In re 350 Encinitas Invs., LLC (In re 350 Encinitas Invs., LLC)*, 313 Fed. App'x 70, 72 (9th Cir. 2009)).

16

Venue is proper pursuant to 28 U.S.C. § 1408(1) and § 1409.

## B. Granting Relief from the Sale Order Pursuant to Fed. R. Civ. P. 60(b)

To discuss the merits of the Second Amended Motion to Surcharge, the Court must first establish legal authority to grant relief from the Sale Order. The Court may grant relief from the Sale Order in one of two ways: (1) construe the Second Amended Motion to Surcharge as an untimely Rule 59(e) motion to amend, allowing the Court to treat the Rule 59(e) motion as if it were a Rule 60(b) motion; or (2) use this Court's power to raise Rule 60(b) *sua sponte*.[12]

1. <u>Construing the Second Amended Motion to Surcharge as an untimely Rule 59(e) Motion</u>

This Court construes the Second Amended Motion to Surcharge as an untimely Rule 59(e) motion to amend. Fed. R. Civ. P. 8(e) ("Pleadings must be construed so as to do justice."); *N. Alamo Water Supply Corp. v. City of San Juan*, 90 F.3d 910, 918 (5th Cir. 1996) (stating that as a "general matter, the caption on a pleading does not constrain the court's treatment of a pleading."); *see also Askanase v. Lawley (In re Lawley)*, No. 05-03296, 2006 WL 2090209, at *2 (Bankr. S.D. Tex. June 30, 2006) (construing a Bankruptcy Rule 8015 motion to amend as a Bankruptcy Rule 9023 motion to amend); *In re Hubbard*, 333 B.R. 373, 376 (Bankr. S.D. Tex. 2005) (finding that all pleadings must be construed to do substantial justice).

This Court treats the Second Amended Motion to Surcharge (an untimely Rule 59(e) motion) as if it were a Rule 60(b) motion. The Fifth Circuit has held that courts "may treat an untimely 59(e) motion to alter or amend the judgment as if it were a Rule 60(b) motion if the grounds asserted in support of the Rule 59(e) motion would support 60(b) relief." *Benson v. St. Joseph Reg'l Health Ctr.*, 575 F.3d 542, 547 (5th Cir. 2009); *Halicki v. La. Casino Cruises, Inc.*, 151 F.3d 465, 470 (5th Cir. 1998) (quoting 12 JAMES W. MOORE ET AL., MOORE'S

---

[12] Rules 59(e) and 60(b) are made applicable by Bankruptcy Rules 9023 and 9024, respectively.

FEDERAL PRACTICE § 60.03[4], at 60-24 (3d ed. 1998)). Further, the Fifth Circuit has stated that there is "no reason an improperly successive Rule 59(e) motion could not similarly be transformed into a Rule 60(b) motion." *Benson*, 575 F.3d at 547 (5th Cir. 2009). In addition to the Fifth Circuit, numerous other circuit courts have done the same. *Nat'l. Ecological Found. v. Alexander*, 496 F.3d 466, 475 (6th Cir. 2007) (holding that lower courts within the Sixth Circuit may construe an untimely Rule 59(e) motion to alter or amend a judgment as a motion for relief from judgment under Rule 60(b)); *Feldberg v. Quechee Lakes Corp.*, 463 F.3d 195, 199 (2d Cir. 2006) ( "[B]ecause the . . . Rule 59(e) motion was improperly filed and was not supplemented until after the ten-day time limit for filing Rule 59 motions, we construe [the] Rule 59(e) motion as a Rule 60(b) motion for relief from judgment."). Because the Second Amended Motion to Surcharge is untimely under Rule 59(e), it must be analyzed under Rule 60(b). *RX.Com v. Hruska*, No. H-05-4148, 2006 U.S. Dist. LEXIS 76427 (Bankr. S.D. Tex. Oct. 20, 2006).

    2.    Raising Rule 60(b) sua sponte

In the alternative, this Court will use its inherent power to raise Rule 60(b) *sua sponte*. The Fifth Circuit has consistently held that the motion requirements of Rule 60(b) may be satisfied by the Court's own motion. *Baum v. Blue Moon Ventures, LLC*, 513 F.3d 181, 190 (5th Cir. 2008); *see also Johnson v. Provident/PCFS*, No. 07-60324, 2008 U.S. App. LEXIS 10234. at * 5 (5th Cir. May 12, 2008) (holding that "[t]he motion requirement of Rule 60(b) can be satisfied on the district court's own motion); *McDowell v. Celebrezze*, 310 F.2d 43, 44 (5th Cir. 1962) (holding that "the district judge can initiate relief from judgment or order on his own motion."). However, when the Court raises 60(b) on its own motion, it must provide written notice and a hearing to the parties of its reconsideration. *Provident*, 2008 U.S. App, LEXIS 10234 at * 5; *Blue*, 513 F.3d at 189. This, the Court has done.

18

On May 26, 2010, this Court held a hearing at which both Sakonchick and the Trustee were present. [Finding of Fact No. 34]. During that hearing, the Court made an oral ruling that it would treat the Second Amended Motion to Surcharge as an untimely Rule 59(e) motion to amend because, in effect, the Second Amended Motion to Surcharge asked the Court to amend the Sale Order. [Finding of Fact No. 34]. The Court also stated that since the Second Amended Motion to Surcharge was filed after the deadline imposed by Rule 59(e), the Trustee would need to introduce evidence to prove that he is entitled to relief under Rule 60(b) while also emphasizing that Sakonchick would have an opportunity to prepare for the Rule 60(b) hearing and cross-examine the Trustee. [Finding of Fact No. 34]. The Court then set two hearing dates for June 7, 2010 at 2:00 p.m. and June 8, 2010 at 9:30 a.m., over ten days after the May 26 hearing. [Finding of Fact No. 34]. Accordingly, the setting of the June 7 and 8 hearings satisfied the Rule 60(b) *sua sponte* hearing requirement. *Blue*, 513 F.3d at 189. Additionally, while the Court never gave an official written notice of the hearing, because both attorneys were present at the May 26 hearing, no written notice was necessary. *See Coie v. Sadkin (In re Sadkin)*, 36 F.3d 473, 475–76 (5th Cir. 1994). Thus, the Court has satisfied all the requirements to raise Rule 60(b) *sua sponte*.

    3.      <u>Grounds for relief under Fed. R. Civ. P. 60(b)</u>

The Court further concludes that it is equitable to grant the Trustee relief from the Sale Order pursuant to Rule 60(b). The Fifth Circuit has stated that "[t]he purpose of Fed. R. Civ. P. 60(b) is to balance the principle of finality of a judgment with the interest of the court in seeing that justice is done in light of all the facts." *Castleberry v. Citifinancial Mortg. Co.*, 230 Fed. App'x 352, 346 (5th Cir. 2007). While a court should not lightly reopen a final judgment, Rule 60(b) should be liberally construed to accomplish substantial justice. *Id*. Here, substantial justice

would be done by reopening the matter because Central Bank failed to give proper and ample notice to the Trustee and all creditors of the Estate that it intended to charge and collect post-petition attorneys' fees and post-petition interest at the default rate and collect these amounts at closing from the proceeds of the sale of the Property. The Court finds that insufficient notice was given to the Trustee and all creditors because, among other things, no § 506 and Rule 2016 applications were filed and none of the documents produced to the Trustee by Central Bank during document production reflected that Central Bank had ever (either pre or post-petition) charged and collected interest at the default rate. [Finding of Fact No. 46]

The Court also makes this finding because counsel for Central Bank should have, but never did, telephone the Trustee and emphasize to him that Central Bank intended to charge and collect post-petition interest at the default rate. Given that Central Bank's counsel had initially represented to the Trustee in an email that the debt owed to Central Bank included post-petition interest at the non-default rate, counsel for Central Bank owed a phone call to the Trustee to expressly inform him that Central Bank had changed its position and now intended to collect interest at the default rate. [Finding of Fact Nos. 35–36]. This phone call never came. Admittedly, Central Bank filed a Proof of Claim January 18, 2010 and sent an e-mail on February 5, 2010 to the Trustee referencing the default rate of interest, so there was notice to this extent. [Finding of Fact No. 36]. However, as the Trustee testified, he is responsible for administering 500-1000 cases chapter 7 cases,  and he simply did not focus on the email or the Proof of Claim due to being inundated with his caseload and because, with Central Bank having already provided him with payoff numbers based upon the non-default rate of interest, he assumed that Central Bank would stick to this representation unless it expressly notified him to

the contrary. [Finding of Fact No. 36]. That is exactly why a phone call from Central Bank's counsel was entirely appropriate and should have been made.

Rule 60(b) reads as follows:

> On motion and just terms, the court may relieve a party or its legal representative from a final judgment, order, or proceeding for the following reasons: (1) mistake, inadvertence, surprise, or excusable neglect; (2) newly discovered evidence that, with reasonable diligence, could not have been discovered in time to move for a new trial under Rule 59(b); (3) fraud (whether previously called intrinsic or extrinsic), misrepresentation, or misconduct by an opposing party; (4) the judgment is void; (5) the judgment has been satisfied, released, or discharged; it is based on an earlier judgment that has been reversed or vacated; or applying it prospectively is no longer equitable; (6) any other reason that justifies relief.

Relief from a final order may be provided if the Court rules that at least one of the Rule 60(b) grounds is applicable. *Hess v. Cockrell*, 281 F.3d 212 (5th Cir. 2002). The Court may examine each of the Rule 60(b) elements, individually, in making its determination, as Rule 60(b)'s six categories are mutually exclusive. *Mullin v. High Mt.*, 182 Fed. App'x 830, 833 (10th Cir. 2006).

    4.    Fed. R. Civ. P. 60(b)(3) is applicable

The Court concludes that the Trustee is entitled to relief under Rule 60(b)(3) based upon the misconduct of Central Bank when viewed in the totality of the circumstances. Rule 60(b)(3) states that a final order may be vacated on the basis of: "(3) fraud (whether previously called intrinsic or extrinsic), misrepresentation, or misconduct by an opposing party."[13] The Court's

---

[13] Fraud and misrepresentation are inapplicable in this case. First, the Trustee failed to allege fraud. Second, even if he had, Central Bank's initial representation that it would be seeking post-petition interest at the non-default rate was eventually corrected by not only its proof of claim, but also by an email to the Trustee on February 5, 2010. [Trustee's Exhibits BB & DD]. Although the Trustee received both of the documents, he did not read either of them. [Finding of Fact No. 36]. Accordingly, the Trustee cannot claim reasonable reliance and, further, cannot claim that he was prevented from "fully and fairly presenting his case" when narrowly considering fraud and misrepresentation. *See Williams v. Thaler*, 602 F.3d 291, 311 (5th Cir. 2010) (quoting *Hesling v. CSX Transp., Inc.*, 396 F.3d 632, 641 (5th Cir. 2005)); *Jackson v. Spear*, 974 F.2d 676, 679 (5th Cir. 1992) (citing *Trenholm v. Ratcliff*, 646 S.W.2d 927, 930 (Tex. 1983)) (noting that an action for fraud requires the other party to rely on a material misrepresentation to his detriment)

analysis, is relegated to any misconduct by Central Bank toward the Trustee and the Court in obtaining the Sale Order.[14]

The Trustee, as the moving party under Rule 60(b)(3), must show: "(1) that the adverse party engaged in . . . misconduct, and (2) that this misconduct prevented the moving party from fully and fairly presenting his case." *Williams v. Thaler*, 602 F.3d 291, 311 (5th Cir. 2010) (quoting *Hesling v. CSX Transp., Inc.*, 396 F.3d 632, 641 (5th Cir. 2005)). Misconduct may occur regardless of "whether there was evil, innocent or careless, purpose." *Bros. Inc. v. W.E. Grace Manu. Co.*, 351 F.2d 208, 211 (5th Cir. 1965), *cert. denied*, 383 U.S. 936 (1966). "For the term to have meaning . . . it must differ from both 'fraud' and 'misrepresentation.'" *MMAR Group, Inc. v. Dow Jones & Co., Inc.*, 187 F.R.D. 282, 285 (S.D. Tex. 1999) (quoting *Anderson v. Cryovac, Inc.*, 862 F.2d 910, 923 (1st Cir. 1988) (internal quotation marks and citations omitted)). "Definition of this difference requires [the court] to take an *expansive* view of 'misconduct[,]'" which may include "accidental omissions." *Id.* (quoting *Anderson*, 862 F.2d at 923) (emphasis added); *see also Rozier*, 573 F.2d at 1339 (concluding that withholding information called for by discovery is considered misconduct).

"Rule 60(b)(3) does not require that the information withheld be such that it can alter the outcome of the case." *Hesling*, 396 F.3d at 641 (quoting *Rozier*, 573 F.2d at 1339). The Fifth Circuit has held that "Rule 60(b)(3) 'is aimed at judgments which are unfairly obtained, not at those which are factually incorrect.'" *Williams*, 602 F.3d at 311 (citing *Hesling*, 396 F.3d at 641

---

[14] The Trustee has also not shown any action for "fraud on the court." Normally, only egregious misconduct will constitute fraud on the court; nondisclosure to the court of pertinent facts will not ordinarily rise to the level of fraud on the court. *See Rozier v. Ford Motor Co.*, 573 F.2d 1332, 1338 (5th Cir. 1978) (citing *Hazel-Atlas Glass Co. v. Hartford-Empire Co.*, 322 U.S. 238 (1944)) (other citations omitted).  In this case, with respect to disclosure to the Court, Central Bank did file a Proof of Claim that indicated—albeit not with great clarity—that it was charging post-petition interest at the default rate (the attachment to the Proof of Claim does not expressly state that Central Bank is using the default rate of interest, but rather simply sets forth what the per diem amount is for each note). Nevertheless, this is sufficient disclosure to remain out of the realm of "fraud on the court."

(quotations and citations omitted)). "The rule is remedial and should be liberally construed." *Hesling*, 396 F.3d at 641 (quoting *Rozier*, 573 F.2d at 1339). The movant must prove misconduct by clear and convincing evidence. *Id.* (citing *Rozier*, 573 F.2d at 1339).

> i.    *Over-secured creditors have an obligation to request all post-petition amounts owed under § 506(b) by filing a § 506(b) application*

There can be no "misconduct" under the definition of the term in Rule 60(b)(3) when a party had no legal, ethical, or moral "obligation" or "duty" to conduct itself in a certain manner or take a certain course of action. *See* BLACK'S LAW DICTIONARY 580, 1089, 1179 (9th ed. 2009). Thus, the Court will address what obligations or duties Central Bank had with respect to § 506(b) and Rule 2016.

Over-secured creditors have an obligation to request post-petition attorneys' fees under § 506(b) by filing a § 506(b) application, in addition to the requirement of filing a Rule 2016 application as set forth in *Sanchez*. *See Sanchez*, 372 B.R. at 303. First, this requirement ensures consistency within § 506(b) with respect to requesting post-petition interest.

Filing a proof of claim seeking post-petition interest and fees—as was done here—will not suffice. A proof of claim may include only ***pre-petition*** claims. *Condrey v. Endeavour Highrise, L.P. (In re Endeavour)*, 425 B.R. 402, 419 & n.8 (Bankr. S.D. Tex. 2010) (citing Official Bankruptcy Form 10, which expressly states, in bold print, that the claimant should set forth the "*Amount of Claim as of Date Case Filed*"); *see also Pride Cos. L.P.*, 285 B.R. at 373. The Fifth Circuit requires an application for post-petition administrative claims,[15] and this Court now finds that requiring a § 506(b) application for post-petition interest is congruent with the Fifth Circuit's ruling on post-petition administrative claims. That finding should be, and is,

---

[15] *See NL Indus., Inc.*, 940 F.2d at 966.

expanded to post-petition attorneys' fees as well. Moreover, this Court in *Sanchez* held that a proof of claim was insufficient by itself to request fees because a Rule 2016 application must be used to show that the post-petition attorneys' fees are "reasonable." *See Sanchez*, 372 B.R. at 303. Indeed, the same reasoning may be used to find that a proof of claim is insufficient by itself to request fees because a § 506(b) application must be used when the attorneys' fees arise "post-petition." Both additional requirements are in place because § 506(b) only allows over-secured creditors "reasonable" attorneys' fees which are incurred "post-petition."

Additionally, § 506(b) requires a court to determine first that the creditor is over-secured after any surcharge under § 506(c). Over-secured creditors ultimately bear the burden of proving, by a preponderance of evidence, that their claim is over-secured; consequently, only after proving their over-secured status are they entitled to post-petition attorneys' fees. *See Fin. Sec. Assurance, Inc. v. T-H New Orleans, L.P. (In re T-H New Orleans, L.P.)*, 116 F.3d 790, 798 (5th Cir. 1997) (citing *In re Grabill Corp.*, 121 B.R. 983, 991-92 (Bankr. N.D. Ill. 1990)). Requiring over-secured creditors to file a § 506(b) application allows the court to make this over-secured valuation finding—through the filing of a motion pursuant to Bankruptcy Rule 3012—and places the burden on the creditor to file in accordance with who bears the final burden of proof. This approach also allows the court to enter an order establishing that the creditor is over-secured before considering the creditor's documentation and other evidence under Bankruptcy Rule 2016 to show the post-petition attorneys' fees are "reasonable" under § 506(b). *See T-H New Orleans, L.P.*, 116 F.3d at 798 (citing *Grabill*, 121 B.R. at 991–92).

In sum, over-secured creditors have the ultimate burden of proof of showing they are entitled to post-petition fees, including proving a referenced agreement with the debtor or a state

24

statute which allows the over-secured creditor to collect post-petition attorneys' fees.[16] Requiring a separate § 506(b) application allows the court an opportunity to determine whether an agreement or State statute exists at the time of the petition's filing and to enter an order establishing that such an agreement or state statute authorizes the over-secured creditor to collect post-petition attorneys' fees. Moreover, having over-secured creditors file a § 506(b) application is appropriate because they bear the ultimate burden of proof to establish their entitlement to post-petition fees. *See Coward*, 91 Fed. App'x at 924.

        ii.    *Post-petition attorneys' fees under § 506(b); Rule 2016 application and documentation*

    § 506 is not the only legal basis requiring the filing of a pleading. Bankruptcy Rule 2016 also requires that a pleading be filed. This Court has previously held that over-secured creditors have an obligation to provide documentation and obtain court approval under Rule 2016 in order to receive post-petition attorneys' fees and other charges under § 506(b). *Sanchez v. Ameriquest Mortg. Co. (In re Sanchez)*, 372 B.R. 289, 303 (Bankr. S.D. Tex. 2007). This requirement exists to ensure that "the court, the debtor, and other parties-in-interest can review and analyze each application for compensation." *Id.* "Courts rely on such applications to gauge the reasonableness of requests under § 506(b)." *Id.* (citing *Jones v. Wells Fargo (In re Jones)*, 366 B.R. 584, 594–95 (Bankr. E.D. La. 2007), *aff'd in part, Wells Fargo Bank, N.A. v. Jones*, 391 B.R. 577 (E.D. La. 2008)). Those parties who fail to file applications containing appropriate disclosures of fees and expenses "make it impossible to determine the charges' reasonableness under § 506(b)" and

---

[16] *Coward v. AC & S, Inc.*, 91 Fed. App'x 919, 924 (5th Cir. 2004) (over-secured creditor has burden of proof and "can meet that burden only by presenting evidence that is *adequate* for the court to determine what hours should be included in the reimbursement.") (emphasis added) (citing *Louisiana Power & Light Co. v. Kellstrom*, 50 F.3d 319, 324 (5th Cir.), *cert. denied*, 516 U.S. 862 (1995)); *In re Valdez*, 324 B.R. 296, 299–300 (Bankr. S.D. Tex. 2005) ("fees and costs are appropriately granted under § 506(b) provided that the creditor satisfies four elements: . . . (4) the fees are provided for under the agreement.").

violate the spirit of disclosure embodied in the Bankruptcy Code.[17] *Id.* at 305. "The three most

important words in the bankruptcy system are: disclose, disclose, disclose." *Id.*

iii.    *Post-petition interest under § 506(b)*

The Fifth Circuit has not expressly addressed whether mere reference to post-petition

interest under § 506(b) in a proof of claim is sufficient notice to recover post-petition interest at

the default rate.[18] Courts have noted that the text of § 506(b) provides no procedure to assert a

claim for post-petition attorneys' fees and post-petition interest. *See Powe v. Chrysler Fin. Corp.,*

*L.L.C. (In re Powe)*, 281 B.R. 336, 346 (Bankr. S.D. Ala. 2001), *appeal dism'd sub nom.,*

*Chrysler Credit Fin. Corp. v. Powe*, 312 F.3d 1241 (11th Cir. 2002)*, cert. denied sub nom.,*

*DaimlerChrysler Servs. N. Am. LLC v. Powe*, 538 U.S. 998 (2003). The Eleventh Circuit has

attempted to fill this gap by holding that a proof of claim containing a reference to post-petition

interest is sufficient notice. *Fawcett v. United States (In re Fawcett)*, 758 F.2d 588, 590 (11th

---

[17] The burden is on the over-secured creditor to show the reasonableness of its fees and other charges by filing an application under Rule 2016 and obtaining an order approving the request for fees and expenses. *Id.* at 304–05. Merely referencing in a proof of claim that post-petition attorneys' fees or other charges are claimed under § 506(b) is insufficient to meet this burden. *See id.* at 303.

[18] The Fifth Circuit noted in *Southland* that the creditor's proof of claim sufficiently referenced *prepetition* interest at the default rate to put the debtor on notice, but the Fifth Circuit never expressly stated that a proof of claim was sufficient in and of itself to provide notice under § 506(b) for requesting *post-petition interest at the default rate.* *Southland Corp. v. Toronto-Dominion (In re Southland)*, 160 F.3d 1054, 1058 (5th Cir. 1998). Moreover, *Southland* is distinguishable. The dispute in *Southland* involved a debtor-corporation in a Chapter 11 case that was very likely only focused on its own bankruptcy case and therefore had the time to carefully review proofs of claim in detail and determine if any objections to post-petition amounts needed to be lodged. *Id.* at 1057. Here, however, the Chapter 7 Trustee administers approximately 500-1000 cases per year and therefore is inundated with a heavy caseload that undermines his ability to discern the post-petition interest rate that each and every creditor wants to charge, particularly when that claimant has already sent the Trustee an email setting forth that it was calculating interest the non-default rate of interest and also when that claimant's proof of claim does not expressly set forth the actual default rate. [Finding of Fact No. 36]. Furthermore, it is worth noting that the creditor in the Fifth Circuit's opinion in *Laymon* affirmatively sought approval for post-petition interest by filing a § 506(b) motion. *Bradford v. Crozier (In re Laymon)*, 958 F.2d 72, 74 (5th Cir. 1992).

26

Cir. 1985) ("For the purposes of section 506(b) of the Bankruptcy Code, post-petition interest may be payable" was sufficient clause in proof of claim).[19]

This Court declines to follow *Fawcett* for several reasons and holds that a creditor has an obligation to affirmatively request its post-petition interest by filing a § 506(b) application. First, from a due process standpoint, this obligation ensures proper notice to the debtor, the trustee, the other creditors, and the Court to test whether the creditor is, in fact, over-secured, to establish the extent of the over-securedness, and to determine the proper rate of post-petition interest to be applied.[20] Imposing the requirement of filing an application to recover post-petition interest is consistent with the Code and the Bankruptcy Rules. Merely referencing post-petition interest in a proof of claim outside a § 506(b) application is insufficient to entitle an over-secured creditor to collect post-petition interest. Over-secured creditors under § 506(b) will only receive what they expressly request and in an application filed under § 506(b).

Second, pursuant to the "plain-meaning" doctrine, this Court has previously held that a proof of claim includes only pre-petition amounts because those are the words set forth in

---

[19] *See also In re Powe*, 281 B.R. at 347 (citing *In re Fawcett* to support a proof of claim as sufficient notice for post-petition attorneys' fees); *In re Bradley*, 94 B.R. 563, 568 (Bankr. N.D.Iowa 1988) (proof of claim referencing post-petition interest sufficient and citing *In re Fawcett*); *In re Conrad*, 142 B.R. 314, 318, 318 n.2 (Bankr. E.D.Ark. 1992) (proof of claim referencing per diem interest accruals is sufficient notice and citing *In re Fawcett*).

[20] Such a request may be combined with a § 506(b) application pursuant to Bankruptcy Rule 2016 to show the reasonableness of post-petition attorneys' fees, but Bankruptcy Rule 2016 does not apply to a request for post-petition interest. Rule 2016 is used to prove the reasonableness of fees, costs, or charges provided for under the agreement claimed under § 506(b). *Sanchez*, 372 B.R. at 304-05. Some courts have held that default interest may be more in the nature of "additional 'fees, costs, or other charges provided for under the agreement' than mere 'interest on such claim'" under § 506(b). *In re Consol. Props. Ltd.*, 152 B.R. 452, 455 (Bankr. D.Md. 1993). Thus, it could be argued that default interest is "per-se unreasonable" and should be subject to the requirements of Rule 2016 under *Sanchez*. This Court declines to do so because the Fifth Circuit has made it clear that the default rate of interest presumptively applies until the equities are proven against its application; therefore, by inference, the default rate of interest is not "per-se unreasonable." *See In re Yazoo Pipeline Co., L.P.*, No. 08-38121, 2009 WL 2857863 (Bankr. S.D. Tex. Aug. 31 2009) (citing *In re Southland*, 160 F.3d at 1059–60).

Official Form 10.[21] *Endeavour* 425 B.R. at 419 & n.8 ("Official Form 10, which is contained in the Federal Bankruptcy Rules, is the proof of claim form. This form expressly states, in bold print, that the claimant should set forth the '*Amount of Claim as of Date Case Filed.*'") (emphasis bolded in original)[22]; *see also Pride Cos. L.P. v. Johnson (In re Pride Cos. L.P.)*, 285 B.R. 366, 373 (Bankr. N.D. Tex. 2002) (noting that a creditor's claim is calculated as of the date of the filing of the bankruptcy petition and does not include fees and other amounts arising post-petition). Because a proof of claim is only for pre-petition amounts, "a party asserting a post-petition claim should file an application with the court and request an order establishing the claim as an allowed administrative claim or an allowed post-petition claim pursuant to a particular statute (such as § 506(b)." *Endeavour*, 425 B.R. at 419 n.8. The Fifth Circuit has concluded that a party must request administrative expenses by a separate application under § 503(a), not by filing a proof of claim. *See NL Indus., Inc.*, 940 F.2d at 966.[23] Given that the Fifth

---

[21] There are exceptions to this general rule. Section 1305(a)(1) & (2) allows for the filing of a proof of claim for post-petition claims against the debtor in specific situations including:

> "[t]axes that become payable to a governmental unit while the case is pending; or [a] consumer debt, that arises after the date of the order for relief under this chapter, and that is for property or services necessary for the debtor's performance under the plan."

These provisions apply, however, only to Chapter 13 cases, not to Chapter 7 cases. 11 U.S.C. § 103(i). Additionally, Congress has not provided for any explicit language in §§ 501 or 502 that post-petition claims are to be included in a proof of claim, while Congress has done so in § 1305(a). The failure to include this specific language evidences an intent by Congress to exclude post-petition claims in a proof of claim filed generally under § 501. *See Kucana v. Holder*, 130 S.Ct. 827, 838 (2010) ("[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.") (citation omitted).

[22] "A proof of claim shall conform substantially to the appropriate Official Form" – Form 10. Bankruptcy Rule 3001(a). Further, "[F]orms govern procedure in cases under title 11 of the United States Code." Fed. R. Bankr. P. 1001; *see also* Fed. R. Bankr. P. 9009.

[23] While Collier's on Bankruptcy recommends a proof of claim for post-petition interest, it also supports the position of requesting post-petition administrative expenses by a separate application under § 503(a), not by proof of claim. *Compare* note 4 *supra*; *with* 4 COLLIER ON BANKRUPTCY ¶ 506.04[6] n.88 (Alan N. Resnick & Henry J. Sommer eds., 16th ed.) ("[T]he holder of an *administrative expense claim does not properly file a proof of claim in respect thereof, but rather files a request for payment pursuant to Section 503(a)*.") (emphasis added). The Court disagrees

28

Circuit has found that administrative expenses, which are post-petition claims, may not be requested by merely filing a proof of claim, this Court is persuaded to extend the same treatment to post-petition interest. *See Endeavour*, 425 B.R. at 419 n.8. The Court is also mindful of its prior holding in *Sanchez* and the great debate among bankruptcy courts regarding post-petition attorneys' fees and other charges. Indeed, a party not only should, but *must*, file an application and request an order establishing the claim for post-petition interest—*i.e.*, must file a § 506(b) application for post-petition interest, not a proof of claim. *See Endeavour*, 425 B.R. at 419 n.8.

Additionally, § 506(b) requires a court to determine first that the creditor is over-secured. Over-secured creditors ultimately bear the burden of proving, by a preponderance of evidence, that their claim is over-secured; only then are they entitled to post-petition interest. *T-H New Orleans, L.P.*, 116 F.3d at 798 (5th Cir. 1997) (citing *In re Grabill* 121 B.R. at 991–92 (Bankr. N.D. Ill. 1990)). Some courts have held that a request for valuation to determine a creditor's over-secured status must be made by motion to the court pursuant to Rule 3012. *United States v. Kiester (In re Envirocon Corp.)*, 218 B.R. 978, 981 (M.D. Fla. 1998) (citing *Agricredit Corp. v. Harrison*, 987 F.2d 677, 681 (10th Cir. 1993); Fed. R. Bankr. P. 3012. Requiring over-secured creditors to file for post-petition interest by a § 506(b) application allows a court to consider a creditor's over-secured status by motion pursuant to Rule 3012. It also properly places the burden on the creditor to file in accordance with who bears the ultimate burden of proof. *See T-H New Orleans, L.P.*, 116 F.3d at 798 (citing *Grabill*, 121 B.R. at 991-92). The court can then enter an order establishing that the creditor is over-secured prior to, or contemporaneously with, considering whether to allow post-petition interest, and, if so, at what interest rate.

---

with Collier's distinction between post-petition interest and post-petition administrative claims in regards to proofs of claim.

A § 506(b) application also provides the Court with an opportunity to rule on the equitable nature of the specific post-petition interest rate requested by the over-secured creditor as called for by the Fifth Circuit.[24] *See In re Laymon*, 958 F.2d 73, 75 (5th Cir. 1992). The bankruptcy court must determine whether to apply a contractual default rate or a contractual non-default rate of post-petition interest by balancing the equities. *Id.* at 75. This determination ultimately requires a court order establishing what rate of post-petition interest to apply. *See Id.*

The Court is aware that a proof of claim is prima facie evidence of the debt owed and that the burden is on the party challenging the claim to file an objection thereto and overcome the presumption of validity. 11 U.S.C. § 502(a); Fed. R. Bankr. P. 3001(f); *McGee v. O'Connor (In re O'Connor)*, 153 F.3d 258, 260–61 (5th Cir. 1998). There is some logic, therefore, that the

---

[24] Over-secured creditors must prove that they are "over-secured" prior to collecting any post-petition interest under § 506(b). *See T-H New Orleans, L.P.*, 116 F.3d at 798 (citing *Grabill*, 121 B.R. at 991–92). While the Fifth Circuit in *T-H New Orleans* notes that the burden is on the "*party* who contends that there is a dispute as to whether a creditor is entitled to interest under § 506(b),") this Court construes this language to mean that if a trustee or a creditor believes that a specific creditor who is claiming to be entitled to post-petition interest is not so entitled because the claimant is not oversecured, then the trustee or the creditor must file a motion with the court. This Court does *not* construe this language (contrary to the argument made by Central Bank's attorney) to mean that a trustee also has to file a motion challenging a secured creditor's right to post-petition interest at the default rate. Rather, this Court concludes that any secured creditor who wants to be paid post-petition interest at the default rate must file such a motion. Moreover, even if this Court's interpretation of this language is incorrect, the Court finds that the facts in *T-H New Orleans* are distinguishable. *Id.* The dispute in *T-H New Orleans* involved a debtor-corporation in a Chapter 11 that was very likely only focused on its own bankruptcy case and therefore had the time to carefully review and object to any proof of claim filed by an over-secured creditor seeking to charge post-petition interest at the default rate. *Id.* at 793. Here, however, the Chapter 7 Trustee administers approximately 500–1000 cases per year and therefore does not have nearly the amount of time as does a Chapter 11 debtor-in-possession to focus on the post-petition interest rates that over-secured creditors want to charge, particularly where, as here, the secured creditor (*i.e.*, Central Bank) has already represented to the Trustee that it was charging post-petition interest at the non-default rate. [Finding of Fact No. 36]. Moreover, even if the Trustee has the burden to show that Central Bank is not entitled to the default rate of interest for post-petition interest accrual, it should nevertheless be the secured creditor's duty to file a § 506(b) motion to alert the court, the trustee, and all creditors that the secured creditor wants to charge the default rate of interest. Then, once this motion is filed, any party opposing the default rate of interest will have the burden to show why this rate of interest should not be allowed. This approach is similar to when a secured creditor files a motion to lift the stay under § 362. Once the motion is filed, § 362(g) sets forth that any party opposing the motion has the burden of proof on all issues except the sole issue of whether the debtor has equity in the property that is the subject of the motion. In the case at bar, the Trustee has in fact challenged the default interest rates used by Central Bank, and the Trustee has also introduced evidence in support of his position. Thus, to the extent that the Trustee has the burden to show that the default rate of interest is inappropriate, he has easily met his burden.

burden should be placed on another party to object to the over-secured creditor's post-petition interest that it requests in a proof of claim instead of placing the burden on the over-secured creditor to separately request its post-petition interest by a § 506(b) application. As has already been noted, however, a proof of claim is prima facie evidence of *pre-petition* claims, not post-petition claims. *See* 11 U.S.C. § 502(a); Fed. R. Bankr. P. 3001(f); *Endeavour*, 425 B.R. at 419 n.8 (citing Official Bankruptcy Form 10); *See also Pride Cos. L.P.*, 285 B.R. at 373. The over-secured creditor should have the burden of proving its over-secured status and requesting a particular post-petition interest rate rather than requiring the trustee, or some other creditor or party-in-interest, to affirmatively raise these issues. Again, this is because the over-secured creditor bears the ultimate burden of proof to establish that its claim is in fact over-secured. *See T-H New Orleans, L.P.*, 116 F.3d at 798 (citing *Grabill*, 121 B.R. at 991–92).

Requiring a § 506(b) application from the creditor to receive post-petition interest is also good public policy. "To maximize equality among creditors, courts closely scrutinize oversecured creditors' requests for post-petition fees, expenses and interest." *Padilla v. Wells Fargo Home Mortg., Inc.* (*In re Padilla*), 379 B.R. 643, 654 (Bankr. S.D. Tex. 2007). A § 506(b) application to request post-petition interest allows the court the opportunity to "closely scrutinize" post-petition interest requests. Over-secured creditors may not bury post-petition interest rates in their proofs of claim, but must openly request the court to approve a rate, which the Court should do by balancing the equities after holding a hearing and receiving evidence. *See Laymon*, 958 F.2d at 75. This more active role brings heightened scrutiny, which is necessary to fulfill the Fifth Circuit's holding in *Laymon*. *Id.* (holding that a bankruptcy court "must examine[] the equities involved in [a] bankruptcy proceeding" to determine whether the default rate of interest is appropriate).

31

Requiring a § 506(b) application ensures that the bankruptcy court will have an opportunity to pass judgment on the rate of post-petition interest charged to the estate and prevent any excessive charging that is inequitable to lower tier creditors. *See Sanchez*, 372 B.R. at 305 (unauthorized charges collected at "expense of the estate's other creditors"). This Court also notes that § 506(b) applications have already been used by parties in several cases considering post-petition interest. *See, e.g., Laymon*, 958 F.2d at 73 (§ 506(b) motion); *Yazoo*, 2009 WL 2857863 at *1 (summary judgment motion under § 506(b)); *In re Cummins Util., L.P.*, 279 B.R. 195, 197 (Bankr. N.D. Tex. 2002) (§ 506(b) motion); *In re Sheppley & Co.*, 62 B.R. 271, 272 (Bankr. N.D. Iowa 1986) (§ 506(b) application); *but see, e.g., Ron Pair*, 489 U.S. at 235 (objection to claim); *Southland*, 160 F.3d at 1057 (objection to claim); *In re Tex. Star Indus. Grp., Ltd.*, No. 06-41518, 2007 WL 4522323 (Bankr. N.D. Tex. 2007) (objection to claim).

For all of the reasons set forth above, this Court concludes that the creditor—here, Central Bank—is not entitled to recover post-petition interest at the default rate merely because it filed a proof of claim in which it set forth a per diem interest amount which is calculated using the default rate. Rather, Central Bank had to file a § 506 application.

> iv.   *Central Bank's misconduct in failing to apply for post-petition attorneys' fees by a § 506(b) application and a Rule 2016 application*

The Court concludes that Central Bank committed misconduct under Rule 60(b)(3) by failing to request post-petition attorneys' fees pursuant to both a Bankruptcy Rule 2016 application and a § 506(b) application. Moreover, Central Bank had an obligation to prove the reasonableness of its post-petition fees by a Bankruptcy Rule 2016 application. *See Sanchez*, 372 B.R. at 303. The record is devoid of any application and documentation under Rule 2016 by Central Bank or the corresponding § 506(b) application. [Finding of Fact No. 44]. Further,

although Central Bank did reference post-petition attorneys' fees in its proof of claim [Trustee's Ex. BB, Bank's Ex. C-3], this Court has already held that a proof of claim is insufficient to request *post-petition* attorneys' fees. *See Id.* at 303. Central Bank has, instead, collected these charges from the Estate without the Court's first approving of their reasonableness. [Finding of Fact No. 44]. The Court further concludes that the failure of Central Bank to meet its obligation constitutes misconduct under the definition of the term.[25] Even if Central Bank was assumed to have "accidentally" failed to file an application under Rule 2016 and an application under § 506(b), accidental omissions may nevertheless constitute misconduct. *Anderson*, 862 F.2d at 923.

The Court now turns to whether Central Bank's misconduct in failing to include Rule 2016 documentation and a § 506(b) application "prevented the moving party from fully and fairly presenting his case." *Williams*, 602 F.3d at 311 (quoting *Hesling*, 396 at 641). The Court finds that the Trustee was indeed prevented from fully and fairly presenting his case. [Finding of Fact No. 44] One of the Trustee's principal duties in a Chapter 7 case is to "maximize the value of the estate." *Commodity Futures Trading Comm'n v. Weintraub*, 471 U.S. 343, 352 (1985) (citing § 704(1)). Any estate's value is depreciated when unnecessary post-petition attorneys' fees are charged against the estate. *See Sanchez*, 372 B.R. at 305. By failing to file a Rule 2016 application and a § 506(b) application, Central Bank never gave the Court the opportunity to determine if Central Bank's post-petition attorneys' fees were allowable and reasonable and never gave the Trustee, the Debtor or other parties-in-interest the opportunity to properly challenge their reasonableness before the Court entered the Sale Order. As this Court stated in *Sanchez*, parties who fail to make such disclosures "make it impossible to determine the charges' reasonableness under § 506(b)" and violate the spirit of disclosure embedded in the Code and the

---

[25] BLACK'S LAW DICTIONARY 580, 1089, 1179 (7th ed. 1999) ("A dereliction of duty; unlawful or improper behavior.").

Rules. *Id.* Furthermore, "failure to disclose charges . . . render those charges *per se* unreasonable." *Id.* By charging the Estate for post-petition attorneys' fees without filing a Rule 2016 application and a § 506(b) application, Central Bank has charged unreasonable and unallowable post-petition attorneys' fees in violation of § 506(b). Such action constitutes misconduct under Rule 60(b)(3).

> v.    *Central Bank's failure to file a § 506(b) application for post-petition interest constitutes misconduct*

The Court finds that Central Bank committed misconduct under Rule 60(b)(3) by failing to request post-petition interest through filing a § 506(b) application. Central Bank had an obligation to request its post-petition interest under § 506(b), but it failed to file any § 506(b) application. [Finding of Fact No. 44]. Central Bank referenced post-petition interest at the default rate in its proof of claim [Trustee's Ex. BB, Bank's Ex. C-3]; however, requesting post-petition interest solely in a proof of claim is insufficient notice to other parties-in-interest and the Court. Central Bank has charged the Estate the default rate of interest without a court order authorizing Central Bank to do so. [Finding of Fact No. 44]. Central Bank has never given the Court the opportunity to balance the equities under *Laymon*, and the Court would have found the default rate of interest to be inequitable if it had; thus, Central Bank has taken $13,596.62 in excessive and unapproved interest charges out of the Estate and away from the Trustee for distribution to other creditors. [Finding of Fact Nos. 39 & 44].

Central Bank argues that the Sale Order included a reference to satisfying Central Bank's lien on the Property with no restrictive language and that this language in the Sale Order authorized Central Bank to collect post-petition interest at the default rate without a separate court order. The Court finds this argument to be disingenuous.  The Sale Order simply provides

34

that with respect to Central Bank, "the Trustee is authorized to pay the following lien at closing" [Finding of Fact No. 15]; there is no express reference to post petition interest at the default rate in the Sale Order. Central Bank's argument that the word "lien" unequivocally includes interest calculated at the default rate begs the question.  When the Trustee submitted the Sale Order to this Court for approval, the Trustee unquestionably believed, based upon representations made to him by Central Bank and its  counsel, that the amount to be paid to Central Bank in order to pay off its lien included interest calculated at the non-default rate—not the default rate.  [Finding of Fact Nos. 35–36]. Thus, Central Bank's misconduct ultimately "prevented the moving party from fully and fairly presenting his case." *Williams*, 602 F.3d at 311 (quoting *Hesling*, 396 at 641). Central Bank received a $13,596.62 windfall by collecting excessive post-petition interest without the Court's authorization and the Trustee has lost access to these funds for distribution to other creditors.

Most importantly, however, the Court and all other creditors lost the opportunity to ensure the requirements of § 506(b) were met prior to a significant amount of excess post-petition interest being charged against the Estate. The Court will not allow such conduct to hold hostage the Court's duty to pass on the equitable nature of Central Bank's entitlement to post-petition interest.

### 5.    The Court's summary findings under Rule 60(b)(3)

Rule 60(b)(3) is "liberally construed" and is aimed at "judgments which are unfairly obtained." *Hesling,* 396 F.3d at 641 (quotations and citations omitted). Central Bank's misconduct prevented the Trustee from fully and fairly litigating the issue as to whether Central Bank was entitled to receive post-petition interest at the default rate and also entitled to recover its post-petition fees. The Estate has been harmed as a result of the Trustee not having fully and

35

fairly litigated this issue with Central Bank. Allowing the Sale Order to be amended by the Second Amended Motion to Surcharge remedies this lack of procedural fairness and ensures that the Estate is not unnecessarily and inappropriately over-charged. *See Williams*, 602 F.3d at 311, *Hesling*, 396 F.3d at 641. The Court also concludes that allowing the Sale Order to be amended is supported by this Court's equity powers under § 105(a) to protect the Trustee and other creditors from Central Bank's misconduct and to ensure compliance with § 506(b) and Bankruptcy Rule 2016. *See also Padilla,* 379 B.R. at 654. Central Bank has no defense that the misconduct in this case was attributable to its attorney's failure to follow proper procedure because the attorney's misconduct is imputed to Central Bank. *See Pioneer*, 507 U.S. at 396–97. The Court further finds that the Trustee has met his burden of proving all elements of both instances of misconduct by clear and convincing evidence based on the totality of the record. *See Hesling*, 396 F.3d at 641 (citing *Rozier*, 573 F.2d at 1339). Accordingly, the Court will amend the Sale Order to rectify the harm done to the Estate as a result of Central Bank's misconduct.

## C. Trustee's Second Amended Objection to Claim No. 8

The Court now turns to the Trustee's Second Amended Objection to Claim No. 8 (contained within the Second Amended Motion to Surcharge). [Doc. No. 116]. The Court will consider: (i) whether Central Bank's proof of claim for pre-petition amounts, which include pre-petition interest at the default rate, should be reconsidered pursuant to § 502(j) and Bankruptcy Rule 3008; (ii) whether Central Bank's claim should be equitably subordinated pursuant to § 510(c); and (iii) whether Central Bank should be allowed post-petition attorneys' fees and post-petition interest pursuant to § 506(b).  In considering these issues, the Court finds that: (a) Central Bank failed to file an application under 11 U.S.C. § 506(b) and Bankruptcy Rule 2016 seeking an order from this Court approving Central Bank's receiving post-petition interest at the

default rate and post-petition attorneys' fees; and (b) Central Bank knowingly collected post-petition interest at the default rate and post-petition attorneys' fees from the proceeds of the sale of the Property (*i.e.*, property of the Estate) despite having no authorization from this Court to do so.

1. Reconsideration of Central Bank's proof of claim for pre-petition amounts pursuant to § 502(j)

The Trustee has objected to Claim No. 8 filed by Central Bank, and asserts that this Court has jurisdiction to adjudicate this dispute under § 502(j) and, by inference, Bankruptcy Rule 3008. [Finding of Fact No 24] The Court will consider the Trustee's objection in regards to *pre-petition* claims included in the proof of claim.[26] Section 502(j), in pertinent part, states that: "A claim that has been allowed or disallowed may be reconsidered for cause. A reconsidered claim may be allowed or disallowed according to the equities of the case."

The Fifth Circuit has emphasized two points in regards to § 502(j). First:

> The bankruptcy court has power to reconsider the allowance or disallowance of proofs of claim "for cause." As the Advisory Committee Note to Bankruptcy Rule 3008 evidences, **the bankruptcy court's discretion in deciding whether to reconsider a claim is virtually plenary,** as the court may decline to reconsider without a hearing or notice to the parties involved. If reconsideration is granted, the court may readjust the claim in any fashion "according to the equities of the case."

*Colley v. Nat'l Bank of Tex.* (*In re Colley*), 814 F.2d 1008, 1010 (5th Cir. 1987) (internal citations omitted) (emphasis added).

Second, the Fifth Circuit has also stated that:

> The court's broad discretion should not, however, encourage parties to avoid the usual rules for finality of contested maters. Bankruptcy Rule 9024 incorporates Federal Rule of Civil Procedure 60 into all matters governed by the Bankruptcy Rules except, inter alia, "the reconsideration of an order allowing or disallowing a

---

[26] A proof of claim shall only include pre-petition amounts. *Endeavour*, 425 B.R. at 419 n.8; Official Bankruptcy Form 10; *See also Pride Cos. L.P.*, 285 B.R. at 373.

claim against the estate entered without a contest is not subject to the one year limitation prescribed in Rule 60(b) . . . ." We interpret Rule 9024 to provide that, when a **proof of claim has in fact been litigated between parties to a bankruptcy proceeding,** the litigants must seek reconsideration of the bankruptcy court's determination pursuant to the usual Rule 60 standards if they elect not to pursue a timely appeal of the original order allowing or disallowing the claim. The elaboration of Section 502(j)'s requirement of "cause" for reconsideration by Rule 60 criteria substantially eliminates the "tension with the right of an appeal for an erroneous final order."

*Id.* (emphasis added) (internal citations omitted). This Court interprets the Fifth Circuit's dual pronouncements in *Colley* to mean that if the parties have not litigated the merits of the proof of claim, Rule 60 is inapplicable and the bankruptcy court has wide discretion pursuant to § 502(j) to determine whether "cause" exists for reconsidering the allowance of a claim. If the parties have litigated the merits of the proof of claim, however, then the bankruptcy court must apply Rule 60(b) in determining whether "cause" exists for reconsidering the allowance of a claim.

In the case at bar, the Court finds that the Trustee and Central Bank have not previously litigated the merits of Central Bank's Claim No. 8. Prior to the Trustee lodging his objection to Central Bank's proof of claim, there is nothing in the record indicating that its validity had been previously litigated. Indeed, "although a claim is 'deemed allowed' if no party in interest objects, such a determination is not final until the conclusion of the case. Proofs of claims themselves are not final judgments giving rise to res judicata, but a court's allowance or disallowance of a proof of claim is a final judgment." *In re Hence*, No. 06-32451, 2007 Bankr. LEXIS 4156, at *15 (Bankr. S.D. Tex. Dec. 5, 2007) (quoting *Poonja v. Alleghany Props. (In re Los Gatos Lodge, Inc.)*, 278 F.3d 890, 894 (9th Cir. 2002)). Accordingly, because the Trustee and Central Bank have not previously in fact litigated the merits of Claim No. 8, this Court concludes that pursuant to *Colley*, this Court is not required to apply Rule 60(b), but rather has wide discretion, based

upon the equities of the case, to determine whether cause exists for reconsidering the allowance of Central Bank's Claim No. 8.

    2.    <u>Exercising its discretion, this Court finds that Central Bank's proof of claim should not be reconsidered.</u>

The Court finds that insufficient cause exists to justify reconsidering the allowance of Central Bank's Claim No. 8. Central Bank has charged the Estate pre-petition interest at the non-default rate. [Finding of Fact No. 37]. Central Bank never charged the Debtor pre-petition interest at the default rate (prior to the bankruptcy filing), even after numerous defaults by the Debtor. [Finding of Fact No. 37]. Central Bank also never listed the default rate of interest in any of its criticized asset reports regarding the Property. [Finding of Fact No. 38]. In short, Central Bank charged the non-default rate of interest at all times prior to the Petition Date, and there is nothing inappropriate about so doing.  The Court will not disallow Central Bank's Claim No. 8 on this basis.

Moreover, the Trustee, in the Second Amended Motion to Surcharge, has not sought to challenge Central Bank's Claim No. 8 under any of the grounds enumerated in § 502(b), under Texas state law, or under any other ground other than equity. [Doc. No. 116 ¶ 13]. Accordingly, the Trustee's objection must fail. A proof of claim is prima facie evidence of the pre-petition debt owed, and the burden is on the party challenging the allowance of the proof of claim to overcome that presumption. 11 U.S.C. § 502(a); Fed. R. Bankr. P. 3001(f); *McGee*, 153 F.3d at 260–61. The Trustee, as the challenging party, has failed to carry his burden. The Court therefore holds that Central Bank's Claim No. 8 is allowed (although Central Bank must still remit to the Estate the post-petition interest and attorneys' fees that it has collected without this Court's authorization).

3.    If the Trustee's challenge to the proof of claim was actually litigated, the Trustee has no recourse under Rule 60(b) regarding the proof of claim for pre-petition amounts.

The Court believes that the Trustee and Central Bank have not previously litigated the merits of Central Bank's Claim No. 8. If the Court is incorrect, however, the Court concludes that the Trustee would still not be entitled to a reconsideration of Central Bank's Claim No. 8 under Rule 60(b). The Court finds no grounds under any provision of Rule 60(b) which would justify relief.

Rule 60(b)(3) is inapplicable for *pre-petition* amounts in Central Bank's Claim No. 8 because the Court finds no fraud, misrepresentation, or misconduct in Central Bank's actions in filing its proof of claim for *pre-petition* amounts. The Court's prior finding of misconduct under Rule 60(b)(3) discussed *supra* was in regards to the failure of Central Bank to request its *post-petition* amounts under a § 506(b) application and a Rule 2016 application and is a separate and distinct finding from Central Bank's actions in requesting *pre-petition* amounts.

4.    Equitable subordination of Central Bank's claim pursuant to § 510(c)

The Court has signed an order that converts the dispute between the Trustee and Central Bank into an adversary proceeding. [Finding of Fact No. 31]. Accordingly, this Court may entertain the Trustee's request that Central Bank's claim be equitably subordinated. Fed. R. Bankr. P. 7001(8); *see also In re Donson*, No. 09-38023, 2010 Bankr. LEXIS 2146, at *7–8 (Bankr. S.D. Tex. June 28, 2010).

Having considered the evidence and oral arguments of counsel, the Court declines to equitably subordinate Central Bank's claim on the merits. Equitable subordination is recognized as "an unusual remedy which should be applied only in limited circumstances." *In re Fabricators, Inc.*, 926 F.2d 1458, 1466–67 (5th Cir. 1991) (citing *Holt v. FDIC (In re CTS Truss,*

40

*Inc.*), 868 F.2d 146, 148–49 (5th Cir. 1989)). Furthermore, the doctrine of equitable subordination is "remedial, not penal, and should be applied only to the extent necessary to offset the specific harm that the creditors suffered on account of the inequitable conduct." *In re Fabricators*, 926 F.2d at 1466–67.

The Fifth Circuit has laid out a three-pronged test to determine "whether and to what extent a claim should be equitably subordinated: (1) the claimant must have engaged in some sort of inequitable conduct; (2) the misconduct must have resulted in injury to the creditors of the bankrupt or conferred an unfair advantaged on the claimant; and (3) equitable subordination of the claim must not be inconsistent with the provisions of the Bankruptcy Code." *In re Clark Pipe & Supply Co., Inc.*, 893 F.2d 693, 697 (5th Cir. 1990) (citing *In re Missionary Baptist Found. of Am., Inc.*, 796 F.2d 752, 760 (5th Cir. 1986)). In the event that *all* three prongs are satisfied, the Court is *permitted*, but *not required*, to subordinate a claim. *Fabricators*, 926 F.2d at 1464–65 n.9. Moreover, when a bankruptcy court subordinates a claim, the determination "must be supported by specific findings and conclusions with respect to each requirement." *In re SI Restructuring, Inc.*, 532 F.3d 355, 361–64 (5th Cir. 2008) (citing *In re Fabricators*, 926 F.2d at 1465).

The Court focuses its analysis solely on the first prong of the *Fabricators* test and concludes that it has not been met. The court in *Clark* stated that three types of conduct "have been recognized as sufficient to satisfy the first prong of the three part test: (1) fraud, illegality, or breach of fiduciary duties; (2) undercapitalization; and (3) a claimant's use of the debtor as a mere instrumentality or alter ego." *In re Clark Pipe*, 893 F.2d at 697. The Trustee has made no allegation that Central Bank's conduct fits into any of these recognized types of conduct. Indeed, the Trustee only argues that Central Bank failed to request its post-petition interest and attorneys'

41

fees in the correct procedural fashion to allow the Court to balance the equities and that Central Bank has improperly charged the Estate post-petition interest at the default rate. While the Court agrees with the Trustee that Central Bank's inactions constitute misconduct, as discussed *supra* under Rule 60(b)(3), these inactions do not rise to the level of actionable fraud. Moreover, even if the Trustee met every prong of the test in *Fabricators*, the Court is not required to subordinate Central Bank's claim and chooses not do so. *See In re Fabricators*, 926 F.2d at 1464–65 n.9. While Central Bank's failure to file a Bankruptcy Rule 2016 application and a § 506 application constitutes misconduct under Rule 60(b)(3), Central Bank's failure to file these pleadings simply does not constitute the circumstances necessary for the "unusual remedy" of equitable subordination to apply. *See Id.*, 926 F.2d at 1466–67 (citing *Holt*, 868 F.2d at 148–49).

> 5. Post-petition attorneys' fees and post-petition interest pursuant to § 506(b)

Bankruptcy Rule 7054 incorporates Rule 54(c), which states in relevant part that "every final judgment shall grant the relief to which the party in whose favor it is rendered is entitled, **even if the party has not demanded such relief in his pleadings**." Fed. R. Civ. P. 54(c) (emphasis added); *see also Engel v. Teleprompter Corp.*, 732 F.2d 1238, 1241 (5th Cir. 1984) (noting that the "liberalizing intent underlying Rule 54(c) counsels that the appropriate relief should not ordinarily be denied."). Furthermore, Bankruptcy Rule 9014(c) notes that "[t]he court may at any stage in a particular matter direct that one or more of the other rules in Part VII shall apply." Bankruptcy Rule 7008, which applies to adversary proceedings, incorporates Fed. R. Civ. P. 8(e), which states that "pleadings must be construed so as to do justice." The Court has previously construed the Second Amended Motion to Surcharge as an untimely filed Rule 59(e) motion to amend and announced on the record that it was construing it as such, thus giving the Trustee and Central Bank fair notice.[Finding of Fact Nos. 21, 29 & 34].

In the case at bar, neither the Trustee nor Central Bank have requested approval of post-petition attorneys' fees and post-petition interest under § 506(b); thus, the Second Amended Motion to Surcharge, Central Bank's Response, and the Supplement do not "state with particularity" that Central Bank is filing a § 506(b) application and that the Trustee is filing an objection to Central Bank's § 506(b) application. The Court finds, however, that both parties have extensively discussed post-petition attorneys' fees and post-petition interest in their pleadings and at oral argument. [Finding of Fact No. 45]. The Second Amended Motion to Surcharge is sufficiently specific under Bankruptcy Rule 9013. *See Aucoin*, 150 B.R. at 647–48. Furthermore, the Court concludes that construing the parties' pleadings to address the issue of post-petition fees and interest under a § 506(b) application allows the Court to grant the Trustee any relief he is entitled to under the law, even if not specifically plead, and construes the pleadings "so as to do justice" for both parties. Fed. R. Civ. P. 54(c); Fed. R. Civ. P. 8(e); Fed. R. Bankr. P. 9014(c); *dee also Engel*, 732 F.2d at 1241.

The Court will therefore construe Central Bank's Response and Central Bank's Supplement as an application for post-petition attorneys' fees and a § 506(b) application for post-petition interest; the Court will also construe the Trustee's Second Amended Objection to Claim No. 8 (contained within the Second Amended Motion to Surcharge) as an objection to Central Bank's § 506(b) application for post-petition attorneys' and also as an objection to Central Bank's § 506(b) application for post-petition interest.

<u>6.</u>      <u>Central Bank is not entitled to post-petition attorneys' fees</u>

The Court concludes that Central Bank is not entitled to collect post-petition attorneys' fees. Section 506(b) requires that the party requesting post-petition attorneys' fees must show: "(1) the creditor's claim is an allowed secured claim; (2) the creditor is oversecured; (3) the fees

are reasonable; and (4) the fees are provided for under the agreement." *In re Valdez*, 324 B.R. at 300. The over-secured creditor bears the ultimate burden of proof that it is entitled to post-petition attorneys' fees. *Coward*, 91 Fed. App'x at 924. Further, over-secured creditors must also submit a Bankruptcy Rule 2016 to show the "reasonableness" of the requested post-petition attorneys' fees. *See Sanchez*, 372 B.R. at 303–05 (noting that the burden is on over-secured creditor to show reasonableness of a fee request by filing Rule 2016 application and obtaining order approving fees).

As previously discussed, the Court finds that Central Bank's proof of claim is deemed allowed and that Central Bank has a secured claim. Central Bank has claimed over-secured status [Doc. No. 76 ¶ 31], and the Trustee acknowledges that Central Bank is over-secured. [Doc. No. 116 ¶ 19(a)(i)]. Additionally, the Court finds that the attorneys' fees requested by Central Bank are authorized under both promissory notes with the Debtor. The Court, however, concludes that Central Bank has failed to carry its burden of showing that its post-petition attorneys' fees are reasonable. Central Bank has failed to attach the required documentation pursuant to Bankruptcy Rule 2016 application to any of its pleadings,[27] even after providing oral argument on the application of this Court's *Sanchez* opinion at the June 21, 2010 hearing. Additionally, the Court will not construe Central Bank's Response and   Supplement as Bankruptcy Rule 2016 applications because even if the Court were to do so, the pleadings, the exhibits, and all of the trial testimony would provide insufficient documentation of compensation as required by Bankruptcy Rule 2016. The failure to attach documentation under Rule 2016 when requesting post-petition attorneys' fees renders those fees "per-se unreasonable." *Sanchez*, 372 B.R. at 305. Central Bank is not entitled to collect unreasonable post-petition attorneys' fees under § 506(b);

---

[27] For example, Central Bank did not attach any invoices.

however, Central Bank has already collected $1,850.00 in post-petition attorneys' fees from the Estate. [Finding of Fact. No. 45]. Therefore, Central Bank must remit to the Trustee the $1,850.00 in post-petition attorneys' fees it improperly collected from the proceeds generated from the sale of the Property.

    7.    <u>Central Bank is not entitled to post-petition interest at the default rate</u>

Central Bank is not entitled to collect post-petition interest at the contractual default rate of interest included in its notes with the Debtor and is entitled only to the non-default rate of interest provided in these instruments. An over-secured creditor is clearly entitled to collect post-petition interest under § 506(b) when the claim is consensual. *Ron Pair*, 489 U.S. at 242–44. The Supreme Court in *Ron Pair*, however, did not establish what rate of interest to be applied. *Laymon*, 958 F.2d at 74. If a claim arises from a contract, "the contract provides the rate of post-petition interest." *Id.* at 75. The court must balance the equities in determining whether to apply a contractual default rate or a contractual non-default rate of post-petition interest. *Id.* The default rate of post-petition interest is presumed valid until the equities weigh against its application. *Southland*, 160 F.3d at 1059–60. In the case at bar, Central Bank has claimed over-secured status [Doc. No. 76 ¶ 31], and the Trustee has acknowledged that Central Bank is over-secured. [Doc. No. 116 ¶ 19(a)(i)]. Thus, the Court must determine only whether the equities weigh against the presumptively valid default rate of post-petition interest.

Relevant factors in a Chapter 7 case that weigh against a presumptively valid default rate of post-petition interest under the balancing of the equities test in *Laymon* include: (1) whether the spread between default and non-default interest rates is large; (2) whether the over-secured creditor was obstructing the bankruptcy process; (3) whether junior creditors will be harmed if the over-secured creditor is awarded default interest; (4) whether the over-secured creditor ever

faced a realistic risk of nonpayment of its debt either before or during the bankruptcy proceedings; (5) whether there is evidence that the non-default contract rate was the prevailing market rate of interest at the time of default and thereafter; (6) whether there is any justification for an increased rate to compensate for an assumed increased risk following default; and (7) whether liquidation of assets will benefit parties in interest. *See Yazoo*, 2009 WL 2857863 at *3 & n.2 (citing *Southland*, 160 F.3d at 1060); *Sheppley*, 62 B.R. at 278–79. This list, however, is not exhaustive and the court may consider other factors it deems pertinent to the particular facts of the case. *Southland*, 160 F.3d at 1060 ("[The] suggestion that a balancing of the equities requires resort to a particular list of factors is by definition flawed. The very purpose of equity is to exalt the individual characteristics of a case over law's hard and fast rules."). As such, this Court will also include a "catch-all" factor so that it may consider other miscellaneous equitable considerations.[28]

        *i.      Whether the spread between default and non-default interest rates is large*

Both loans 70116950 and 70118350 authorized a post-maturity (*i.e.*, default) rate of interest of 18% per annum. [Finding of Fact No. 39]. The non-default rate of interest on the Petition Date was 4.25% on loan 70116950 and 5.25% on loan 70118350, respectfully. [Finding of Fact No. 39]; [Trustee's Ex. R]. The per diem interest amount charged at the non-default rate was $12.6104 on loan 70116950 and $16.7327 on loan 70118350, respectfully. [Finding of Fact No. 39]. [Trustee's Ex. P]. Central Bank collected post-petition interest at the default rate of 18% from the proceeds of the sale of the Property, which amounted to per diem charges of $53.40 on loan 70116950 and $57.36 on loan 70118350, respectfully. [Finding of Fact No. 39]; [Trustee's

---

[28] Balancing the equities as called for under *Laymon* inherently entails a comprehensive review of the facts of the case applied to relevant factors affecting the equity of charging post-petition interest at the default rate. *See Laymon*, 958 F.2d at 75 (balance the equities); *Southland*, 160 F.3d at 1060 ("exalt the individual characteristics" of a case).

Ex. DD]. The spread between default and non-default interest rates on loan 70116950 is 13.75%, which amounts to a per diem difference of $40.7896; loan 70118350 has a spread of 12.75%, which amounts to a per diem difference of $40.6273. The total per diem spread amounts to $81.4169.

The Court first concludes that the spread between default and non-default interest rates on both loans to be significantly large. A 13.75% and a 12.75% spread are inequitable and both are over four times larger than the range that other courts have found to be "reasonable." *See, e.g., Southland,* 160 F.3d at 1060 (2% spread is "relatively small."); *In re Ace-Texas, Inc.,* 217 B.R. 719, 724 (Bankr. D. Del. 1998) (2% spread reasonable); *In re Terry Ltd. P'ship,* 27 F.3d 241, 244 (7th Cir. 1994) (3% spread reasonable). Moreover, the Court also concludes that a reduction of $81.4169 from the Estate each day as a result of post-petition interest being charged at the default rate instead of the non-default rate is a significant depletion of the Estate's assets. This total excess per diem charge of $81.4169 for the default rate of post-petition interest has cost the Estate $13,596.62 from the Petition Date to the date of the Property's sale on February 15, 2010 (*i.e.,* 167 days).  [Finding of Fact No. 39]. As such, this factor weighs heavily against approving the default interest rates set forth in the note held by Central Bank.

      ii.      *Whether the over-secured creditor was obstructing the bankruptcy process*

In one sense, Central Bank was not obstructing the bankruptcy process insofar as Central Bank took no action to undermine the Trustee's efforts to sell the Property. Nothing in the record indicates that any delay in selling the Property was a result of Central Bank's actions in unnecessarily objecting to motions by the Trustee. In the Second Amended Motion to Surcharge, the Trustee asserted that "[b]ut for the problems created by Doc's Trading, this sale could have proceeded very quickly." [Docket No. 116 ¶ 19(c)(i)]. The Trustee does not lay blame for the

delay on Central Bank. Indeed, As discussed previously when considering the Trustee's Second Amended Motion to Surcharge *supra*, Central Bank actually assisted the Trustee in pursuing the sale and encouraged him to do so. [Finding of Fact No. 43].

In another sense, however, Central Bank did obstruct the bankruptcy process by failing to file an application pursuant to § 506(b) and Bankruptcy Rule 2016 to obtain this Court's approval to charge and collect its post-petition fees and post-petition interest at the default rate.

On balance, this factor weighs against approving the default rate of interest.

      *iii.*    *Whether junior creditors will ever be harmed if the over-secured creditor is awarded default interest*

Much as the Fifth Circuit concluded in *Southland*, this Court recognizes that this factor has special significance. *See Southland*, 160 F.3d at 1060. In *Southland*, the Fifth Circuit noted that "no junior creditors will be harmed if the Banks are awarded default interest." *Id.* Here, conversely, the Court finds that there is sufficient evidence that junior creditors will be harmed by Central Bank's decision to charge post-petition interest at the default rate. Indeed, the Trustee's testimony and the exhibits admitted into evidence show, even in their most conservative of estimates, that general unsecured creditors will receive no compensation and priority unsecured creditors will not be paid in full as a result of Central Bank's decision to charge post-petition interest at the default rate. [Finding of Fact No. 41]. As such, this factor weighs heavily against allowing any default interest rate charged by Central Bank.

      *iv.*    *Whether the over-secured creditor faced a realistic risk of nonpayment of its debt either before or during the bankruptcy*

The Court concludes that Central Bank did not face a realistic risk of nonpayment of its debt either before or during this Chapter 7 case. Indeed, Central Bank never charged the Debtor pre-petition interest at the contractual default rate. [Finding of Fact No. 37]. Central Bank also

noted that the loan was "not considered to have loss exposure" in its June 30, 2009 Criticized Asset Status Report, a mere two months before the Debtor filed its Chapter 7 petition. [Finding of Fact No. 38]. Moreover, after the Debtor filed its petition, Central Bank never indicated to this Court that it was concerned its claim would not be repaid. [Finding of Fact No. 43]. Further, the Trustee has always acknowledged that Central Bank is an over-secured creditor; Central Bank has always asserted that it is an over-secured creditor; and the sale of the Property shows that Central Bank's claim was over-secured by over $250,000. [Finding of Fact No. 42]. Central Bank, as an over-secured creditor, was paid in full and also took, without authorization, post-petition interest and attorneys' fees as part of the proceeds of the sale of the Property. [Finding of Fact Nos. 16 & 42]. Accordingly, Central Bank never faced a realistic risk of nonpayment of its debt either before or during this Chapter 7 case. As such, this factor weighs heavily against approving the default interest rate.

>  v.  *Whether there is evidence that the non-default contract rate was the prevailing market rate of interest at the time of default and thereafter*

Sufficient evidence has been introduced indicating that the non-default contract rate was the prevailing market rate of interest at the time of maturity (*i.e.*, default) of the loans and thereafter. The loan documents for both loan 70116950 and loan 70118350 expressly provide that "[t]he interest rate on this Note is subject to change from time to time based on changes in an independent index which is the Wall Street Journal's Prime Lending Rate (the "Index") . . . If the index becomes unavailable during the term of this loan, Lender may designate a substitute index after notifying Borrower." [Trustee's Exs. L, M]. There is no evidence showing that Central Bank altered the index to be used and notified the Debtor. A search by the Court indicates that, during the past year, the Wall Street Journal's Prime Lending Rate has remained

steady at 3.25%.[29] The non-default rate of interest at the time of the filing of the bankruptcy petition on September 1, 2009 was 4.25% on loan 70116950 and 5.25% on loan 70118350, respectively. [Finding of Fact No. 39]; [Trustee's Ex. R]. These rates were 1% and 2% over prime, respectively. [Docket No. 116 ¶ 18]. The Supreme Court, in *Till v. SCS Creditor Corp.*, held that a formula approach starting with the prime interest rate and adjusting for additional risk is the proper way to calculate interest in a Chapter 13 case. 541 U.S. 465, 479–85 (2004). Indeed, *Till* persuades this Court that in balancing the equities under *Laymon*, determining if the non-default rate was the prevailing market rate when the parties have agreed to base their variable interest rate on the prime lending rate is appropriate. *See Till*, 541 U.S. at 468. Given that Central Bank did not believe it had a risk of loss with the loans [Finding of Fact No. 38], which would imply a need for adjustment in the interest for risk, the Court concludes that there is sufficient evidence that the non-default rate of post-petition interest was the prevailing market rate of interest at the time of default and thereafter. As such, this factor weighs against approving the application of any default interest rate charged by Central Bank

      vi.    *Whether there is any justification for an increased rate to compensate for an assumed increased risk following default*

There is no justification for an increased rate to compensate Central Bank for any assumed increase in risk following default. As noted *supra*, Central Bank never charged the Debtor pre-petition interest at the contractual default rate, even though the Debtor defaulted numerous times. [Finding of Fact No. 37]. Central Bank was paid at the non-default rate of interest pre-petition as late as August 10, 2009, only twenty-one days prior to the filing of the Debtor's petition. Moreover, Central Bank did not believe it had a risk of loss with the loans. [Finding of Fact No. 38]. Central Bank readily admits that it could have foreclosed on the

---

[29]    *Consumer Rates and Returns to Investor: Prime rate 52-week range*, Wall St. J., Jun. 30, 2010, at C4.

Property and completely satisfied its lien. [Finding of Fact No. 21]. Further, Central Bank never charged the Debtor pre-petition interest at the default rate, even as late as August 10, 2009. Central Bank is now talking out of both sides of its mouth by implying added risk post-maturity, yet simultaneously providing evidence that it had no risk. Central Bank can offer no sufficient justification for an increased rate to compensate for its alleged increased risk following default by the Debtor. As such, this factor weighs heavily against approving default interest rate.

<em>vii.      Whether liquidation of assets will benefit parties in interest</em>

The Court finds no evidence on record from either the Trustee or Central Bank that indicates whether liquidation of assets will or will not benefit parties in interest. As such, this factor weighs neither in favor nor against allowing the default rate of interest.

<em>viii.     Other factors which this Court considers in addition to factors 1–7 above</em>

> a.   Whether the over-secured creditor has ever charged the debtor interest at the default rate pre-petition, particularly when it was authorized to do so by the underlying agreement

The Court finds that Central Bank never charged the Debtor pre-petition interest at the default rate when it could have done so by the very terms of the notes [Finding of Fact No. 37]. Central Bank, however, chose to charge the Estate post-petition interest at the default rate when it collected on its lien from the proceeds of the sale of the Property. [Finding of Fact Nos. 16 & 39]. Central Bank admits that it could have foreclosed on the Property and fully satisfied its lien. [Finding of Fact No. 21]. The Court concludes that it is inequitable to charge the Estate post-petition interest at the default rate when Central Bank never charged the Debtor pre-petition interest at the default rate when it could have done so. As such, this factor weighs against approving the default rate of interest.

51

      b.      The Trustee expended efforts to liquidate the Property and obtain subordination agreements from junior lienholders in order to have sufficient unencumbered funds to make a distribution to unsecured creditors

The Court finds that the Trustee expended substantial effort to sell the Property post-petition. The Court has addressed the Trustee's efforts in detail when discussing the Trustee's Second Amended Motion to Surcharge *supra*. It is sufficient to note that the Trustee employed the Realtor [Finding of Fact No. 10], prepared the Sale Order [Finding of Fact Nos. 8 & 15], negotiated claims subordination agreements with certain junior lienholders.[30] [Finding of Fact Nos. 12–14], communicated with Central Bank's counsel, and sold the Property [Finding of Fact No. 16]. This is not an exhaustive list, but shows at a cursory level that the Trustee expended considerable time and energy in order to liquidate the assets of the Debtor post-petition. Additionally, the Trustee spent time obtaining consent from junior lienholders from the Property to limit the amount of their liens so that there would be sufficient unencumbered proceeds from the sale of the Property to make a distribution to unsecured creditors. Allowing Central Bank to charge post-petition interest at the default rate would undermine the Trustee's efforts to make as large a distribution as possible to unsecured creditors. For all of these reasons, this factor weighs against approving the default interest rate.

In sum, the Court concludes that a balancing of the equities weighs heavily in favor of denying Central Bank post-petition interest at the contractual default rate under § 506(b). Indeed, out of the nine factors discussed above, one factor is neutral, and eight factors weigh against the application of the default rate of interest. Use of default rate of interest based on the particular facts of this case is therefore inequitable. The Court is particularly persuaded by: (a) the large

---

[30] The Trustee negotiated claims subordination agreements with secured creditors on the Property whose liens were junior to Central Bank's lien in order that the Trustee, after selling the Property, would be able to have unencumbered funds for distribution to unsecured creditors. [Finding of Fact Nos. 12–14].

disparity between the default and non-default rate of interest on the mortgage; (b) Central Bank's failure to charge the Debtor pre-petition interest at the default rate when it could have done so under the loan agreements; and (c) the evidence that the non-default contract rate was the prevailing market rate of interest at the time of maturity (*i.e.*, default) of the loan and thereafter. However, nearly all of the other factors previously identified militate in favor of denying Central Bank post-petition interest at the contractual default rate. For these reasons, Central Bank shall only be allowed to collect post-petition interest at the contractual non-default rate on both loans 70116950 and 70118350. Central Bank charged the Estate post-petition interest at the default rate, which resulted in an excess charge of $13,596.62 beyond the non-default rate. [Finding of Fact No. 39]. Therefore, Central Bank must remit to the Trustee the $13,596.62 in excess post-petition interest it charged beyond the contractual non-default rate and collected from the proceeds generated from the sale of the Property.

### D. Surcharge pursuant to 11 U.S.C. 506(c)

The Court has determined that the Trustee is entitled to relief from the Sale Order under Rule 60(b). Therefore, the Sale Order will be amended to include a surcharge against Central Bank, subject to the Court's determination of its reasonableness under § 506(c).

§ 506(c) allows the Trustee to recover a surcharge for the reasonable and necessary costs and expenses (including ad valorem property taxes) of disposing of property secured by an allowed, secured claim. The four elements to consider in allowing a surcharge is whether the expenditures were: (1) necessary; (2) reasonable in amount; (3) beneficial to the creditor being surcharged; and (4) incurred primarily for the benefit of the secured creditor. *New Orleans Pub. Serv., Inc. v. First Fed. Sav & Loan Ass'n (In re Delta Towers, Ltd.),* 924 F.2d 74, 76 (5th Cir. 1991); *TNB Fin., Inc. v. James F. Parker Interests (In re Grimland, Inc.),* 243 F.3d 228, 232 (5th

Cir. 2001); *United States v. Ralph Owens Trucking Co. (In re Ralph Owens Trucking Co.)*, Adv, No. 09-04215, 2010 Bankr. LEXIS 194, at *7 (Bankr. N.D. Tex. 2010) (citing *PSI, Inc. of Missouri v. Aguillard (In re Senior-G & A Operating Co.*, 957 F.2d 1290, 1298–99 (5th Cir. 1992)).

       1.      <u>The expenditures associated with the sale of the Property were both reasonable and necessary.</u>

The expenses that the Trustee asserts were incurred by the Estate are as follows: Trustee fees under § 326(a) (the Trustee asserts that he is entitled to the maximum amount of $28,250.00), attorneys' fees incurred by the Trustee for services rendered by the law firm that he retained ($2,615.85), the real estate commission ($30,000.00), the annual assessment ($634.07), title insurance ($2,979.00), property taxes ($13,424.79), and other additional taxes ($2,071.91), totaling $77,903.71. [Finding of Fact No. 2].

          *i.*    *Necessity of the expenditures*

The costs and expenses requested by the Trustee are those for which a trustee typically invokes § 506(c) to obtain reimbursement. Indeed, the Honorable D. Michael Lynn, United States Bankruptcy Judge for the Northern District of Texas, states as much:

> Typically, a trustee invoking section 506(c) does so to obtain reimbursement for insurance, maintenance, or security costs, or the costs of sale of the creditor's collateral. Those sorts of expenses clearly involve preservation or disposition of the collateral. They are expenses the creditor would have to incur to prevent the loss of value or **to realize on its collateral**.

*Ralph Owens*, 2010 Bankr. LEXIS 194, at * 6 (emphasis added). The Trustee credibly testified that the expenses incurred were very necessary in order to effectively dispose of the Property. [Finding of Fact No. 2]. Additionally, other creditors agreed to the Trustee's surcharge, indicating that they found the expenses to be both necessary and reasonable. [Finding of Fact No.

12–14]. Therefore, this Court finds that the expenses associated with the sale of the Property were necessary.

        *ii.*       *Reasonableness of the amount of the expenditures*

        a.      Fees claimed by the Trustee pursuant to § 326(a)

The Trustee testified that his trustee fees were calculated pursuant to the guidelines promulgated in § 326(a). Under this statute, the maximum amount of the Trustee's fee (in this instance, asserted to be $28,250.00) is determined by the amount that the Trustee distributes to creditors.[31] 11 U.S.C. 326(a). The Trustee's calculation, however, is inappropriate for determining whether fees are reasonable for purposes of surcharging a secured creditor under 11 U.S.C. § 506(c). 11 U.S.C. § 326(a) is a limitation on a trustee's compensation under 11 U.S.C. § 330. *In re* McCombs, No. 06-35891, 2010 Bankr. LEXIS 2758, at * 74 (Bankr. S.D. Tex. Aug. 17, 2010) ("The Court expressly rejects the assertion that a trustee may obtain a 506(c) surcharge against a secured creditor's collateral in the amount of the statutory maximum commission under 326(a)"). Here, the compensation sought by the Trustee is brought pursuant to 11 U.S.C. 506(c). 11 U.S.C. 506(c) allows for reasonable and necessary costs and expenses related to the preservation or disposal of property. Accordingly, the only attorneys' fees for which the Trustee may surcharge Central Bank are those fees directly relating to the services provided by the Trustee's Law Firm in conjunction with the preservation and sale of the Property. As such, this Court will analyze the fee statements of the Trustee's law firm and make a determination of

---

[31] 11 U.S.C. § 326(a) states "the court may allow reasonable compensation of the trustee for the trustee's services , payable after the trustee renders such services, not to exceed 25 percent on the first $5,000 or less [dispursed], 10 percent on any amount [dispursed] in excess of $5,000 but not in excess of $50,000, 5 percent on any amount [dispursed] in excess of $50,000 but not in excess of $1,000,000." Because the Trustee sold the Property for the amount of $500,000.00, it is this figure that is used to make the calculation under § 326(a). Accordingly, the Trustee's requested compensation of $28,250.00 is calculated as follows: ($5000 x .25) + ($45,000 x .10) + ($450,000 x .05) = $28,250.00.

which services directly relate to the preservation and sale of the Property, and whether the value those services is reasonable.

The Trustee's Second Amended Motion to Surcharge requests $2,615.86 in attorneys' fees [Finding of Fact No. 2], but he apparently does so because he is under the mistaken belief that this Court is going to award him $28,250.00. Given his mistaken belief, this Court believes that to award the Trustee attorneys' fees of only $2,615.86 would be unfair. Therefore, this Court has analyzed the Trustee's time sheets as if the Trustee had never requested the $28,250.00 under § 326(a). By doing so, the Court has concluded, as discussed below, that the reasonable and necessary fees incurred by the Trustee for disposing of the Property total $16,222.50.

b.      Attorneys' fees incurred by the Trustee

The Court has reviewed the time sheets of the Trustee's Law Firm. In reviewing these time sheets, the Court has determined which of these entries relate to services rendered for the sale of the Property. Attached to this Memorandum Opinion as Exhibit A are those entries which this Court concludes relate to services rendered for the sale of the Property. These time records show that services were performed by "N," "RDT," "JK," and "SZ." There is no question that "RDT" and "JK" are references to Rodney Tow (*i.e.*, the Trustee) and Julie Koenig. "SZ" and "N" are unidentified, but are clearly the initials of two legal assistants at the Trustee's Law Firm. The services rendered by the Trustee's Law Firm relating to the sale of the Property amount to $16,222.50 for 46.82 hours of work. The Trustee's Law Firm spent much of this time drafting and prosecuting the Motion to Sell.[32]

---

[32] This Court analyzed the Trustee's fees pursuant to the guidelines as set forth in *n re First Colonial Corp. of Am*, 544 F.2d 1291, 1299–1300 (5th Cir. 1977). Except for the Trustee's lumping of fees (as explained *infra*), this Court concludes that the fees incurred relating to the sale of the Property are reasonable and that the services rendered which generated the fees were necessary.

In numerous instances, however, the individuals at the Trustee's Law Firm who provided services "lumped" their time entries in violation of the U.S. Trustee's Fee Guidelines,[33] and the Court is unable to discern how much time these individuals allocated to these activities and the value of the services rendered by the attorney or support staffer performing these services.

For example, on December 8, 2009, the Trustee spent 2.93 hours performing four discrete services, which are set forth verbatim as follows: "COMPLETION OF THE MOTION TO SELL. EMAILS TO CREDITORS REGARDING MOTION TO SELL. REVIEW OF THE APPLICATION TO EMPLOY AMANDA. EMAIL TO AMANDA AND CHUCK REGARDING THE LEGAL DESCRIPTION." [Trustee's Ex. JJ]. By way of another example, on October 2, 2009, Julie Koenig spent 3.4 hours performing six discrete tasks, which are set forth verbatim below:

> MET WITH AMANDA & TRUSTEE RE: SALE OF PROPERTY & LIENS; PULLED COPIES OF ALL ABSTRACTS OF JUDGMENT, TAX LIENS, ETC., REVIEWED FOR CONSISTENCY WITH STATE LAW; OBTAINED PHONE NUMBERS OF ALL COUNSEL; PREPARED SPREADSHEET OF ABSTRACTS; DISCUSSED WITH TRUSTEE.

[Trustee's Ex. JJ].

"When time entries are vague or lumped together, such that the Court cannot determine how much time was spent on particular services, then the creditor has not met its burden to show that fees are reasonable." *In re Energy Partners*, 422 B.R. at 89

---

[33] *Available* at http://www.justice.gov/ust/eo/rules_regulations/guidelines/docs/feeguide.htm (reprinted at 28 C.F.R. Pt. 58, App. A). Although these guidelines refer to applications filed under 11 U.S.C. § 330, the Court sees no reason why these guidelines should not equally be applied to applications filed under § 503(c). *See In re Energy Partners, Ltd.*, 422 B.R. 68, 88 n. 16 (Bankr. S.D. Tex. 2009). The specific language in these guidelines which this Court concludes is applicable in the care at bar is:

> Time entries should be kept contemporaneously with the services rendered in time periods of tenths of an hour. Services should be noted in detail and not combined or "lumped" together, with each service showing a separate time entry; however, tasks performed in a project which total a de minimis amount of time can be combined or lumped together if they do not exceed .5 hours on a daily aggregate.

(quoting *In re 900 Corp.*, 327 B.R. 585, 598 (Bankr. N.D. Tex. 2005)); *In re Ward*, 190 B.R. 242 (Bankr. D. Md. 1995) (noting that a percentage reduction in fees under § 506(b) is appropriate when tasks were lumped together in time entries)).

Disappointingly, of the twenty-five (25) time entries that this Court found related to the preservation and sale of the Property, twelve (12) violate the U.S. Trustee's Guidelines prohibiting lumping. Moreover, all of these entries are for substantial periods of time, ranging from .52 hours to 5.2 hours. Indeed, all of the times are above the 0.5 hour or less limit noted in this Court's *Energy Partners* case. *In re Energy Partners*, 422 B.R. at 89; *see also In re Pan Am. Gen. Hostp., LLC,* 383 B.R. 855, 875 (Bankr W.D. Tex. 2008) (awarding all of the requested fees despite lumping because the time was relatively small and allocating time to each task loses its convenience and utility). And, there is nothing in the record to justify the lumping by the Trustee's Law Firm. While the Trustee may have been relying—incorrectly—on the statutory maximum compensation award in §326(a) as a reason why the Trustee's Law Firm did not have to concern itself with the lumping of time, that alone is not enough. It is not difficult to record the amount of time spent on each discrete service provided, and this Court intends to enforce the U.S. Trustee's Guidelines.

As noted in *Energy Partners*, the existence of lumping does not mean that the fees of the Trustee's Law Firm are *per se* unreasonable. *In re Energy Partners*, 422 B.R. at 90. Indeed, the Court's review of the invoices leads the Court to conclude that the services that were provided were necessary for the preservation and sale of the Property, and that the hourly rates charged by the individuals providing the services were

reasonable.[34] However, because lumping violates U.S. Trustee Guidelines, the Court concludes that a reduction in the fees is appropriate. Unlike *Energy Partners*, however, this Court will goes beyond the twenty-five percent fee reduction to a fifty percent fee reduction. *Id.* It does so for two reasons. First, the Trustee holds his position due to appointment by the United States Trustee, and it is the United States Trustee who has promulgated guidelines that forbid lumping. Accordingly, there is no excuse for the Trustee's Law Firm to be in direct violation of a United States Trustee guideline. Second, many of the lumped time entries occurred after this Court's *Energy Partners* opinion was published. A simple review of this Court's recent cases would have alerted the Trustee to the fact that lumped time entries could result in a percentage reduction of attorneys' fees. In sum, the attorneys' fees of the Trustee's Law Firm relating to the sale of the Property, taking into account the existence of lumping, are reasonable after calculating in the fifty percent reduction. Therefore, because these fees total $16,222.50, and because a fifty percent reduction will be made due to lumping, the total recoverable fees relating to the sale of the Property is $8,111.25 (*i.e.*, 16,222.50 x 50%).

c.    All other costs and expenses

This Court finds that the other expenses incurred by the Trustee on behalf of the Estate—the real estate commission ($30,000.00), the annual assessment ($634.07), title insurance ($2,979.00), and property taxes ($13,424.79), and other additional taxes

---

[34] The hourly rate of both Rodney Tow and Julie Koenig is $375.00, and the hourly rates of the legal assistants at the Trustee's Law Firm are $50.00 and $60.00, respectively. The Court finds these rates to be reasonable given the fact that Rodney Tow has been practicing bankruptcy law for more than twenty-five years and Julie Koenig has been practicing bankruptcy law for approximately twenty-two years. [Doc. No. 11]. Indeed, there are many less-experienced attorneys at both small and large firms in Houston, Texas who work in the bankruptcy sections of those firms and whose hourly rates exceed $375.00. Moreover, there are many legal assistants at small and large firms in Houston whose hourly rates greatly exceed $60.00. For all of these reasons, the Court finds that the hourly rates of all individuals at the Trustee's Law Firm are reasonable.

($2,071.91)— are reasonable in amount. Because these particular expenses were paid at closing from the sale proceeds—*i.e.*, the Trustee never had to come out of pocket to pay any of these costs—the Trustee may not now seek to surcharge Central Bank for these costs: that would be "double dipping." What the Trustee may now surcharge against Central Bank is solely the reasonable fees of the Trustee's Law Firm, which have already been determined as set forth above.   Accordingly, the total amount that the Trustee may surcharge Central Bank is that bank's pro-rata share of $8,111.25 (which is calculated on pro-rata basis as explained *infra*).

    2.      <u>Calculating the 11 U.S.C. § 506(c) surcharge.</u>

The sales price of the Property was $500,000.00. The payoff to Central Bank, subtracting the $13,596.62 (in unauthorized, post-petition interest at the default rate)  and the $1,850.00 (in unauthorized post-petition attorneys' fees) that Central Bank must remit to the Estate, is $233,621.17. As such, Central Bank's pro-rata share of the surcharge is 46.72%.[35] Therefore, the total surcharge against Central Bank—46.72% of $8,111.25—is $3,789.58

    3.      <u>Central Bank benefited from the expenses related to the sale of the Property and the expenses were incurred primarily for its benefit.</u>

Central Bank clearly benefited from the sale of the Property, as the Trustee paid off its lien on the Property in full (minus the unauthorized post-petition interest calculated at the default rate and unauthorized post-petition attorneys' fees that this Court has required Central Bank to remit to the Estate). Moreover, this Court finds that the sale of the Property was incurred primarily for Central Bank's benefit. As such, Central Bank benefited from expenses incurred by

---

[35] Surcharging creditors on a pro rata basis pursuant to 11 U.S.C. § 506(c) is appropriate. *In re Boyer*, 141 B.R. 214, 216 (Bankr. D. Kan. 1992).  The sales price of the Property was $500,000.00. The payoff to Central Bank, subtracting the $13,596.62 in accrued post-petition interest at the default rate and the $1,850.00 in post-petition attorneys fees, is $233,621.17 (as explained *infra*). As such, Central Bank's pro-rata share of the surcharge is 46.72%. (*i.e.*, $233,621.17/$500,000 = .4672)

the Trustee, and the sale of the Property was incurred primarily for the benefit of Central Bank. Therefore, because the expenses were necessary and reasonable, and were primarily for the benefit of Central Bank, the Trustee's § 506(c) surcharge against Central Bank is appropriate.

### V. CONCLUSION

In sum, with the Court having construed the Second Amended Motion to Surcharge as a motion to amend the Sale Order, the Court finds that the Sale Order should be amended. Right now, the penultimate paragraph on the third page of the Sale Order reads as follows: "it is further, Ordered that the Trustee is authorized to pay the following lien at closing: Central Bank." [Finding of Fact No. 15]. As this Court has noted in this Memorandum Opinion, this language does not expressly set forth the amount of the lien. Given the dispute between the parties as discussed herein, the specific amount of the lien needs to be expressly set forth, including how much of the lien should be surcharged. Accordingly, the Court finds that the penultimate paragraph on the third page of the Sale Order should be changed to read as follows: "**Ordered** that the Trustee is authorized to pay, at closing, Central Bank's lien in the amount of $233,621.17; provided, however, that prior to the disbursement of these funds to Central Bank, the Trustee shall directly receive $3,789.58 of these funds (representing Central Bank's pro-rata share, *i.e.*, 46.72%, of the total attorneys' fees to which the Trustee is entitled to recover under 11 U.S.C. § 506(c) relating to the sale of the property), with Central Bank to receive  the remaining $229,831.59."

Given this amendment to the Sale Order, Central Bank must remit a check to the Trustee's Law Firm for the amount of $3,789.58.

Additionally, with the Second Amended Motion to Surcharge also containing the Trustee's objection to Central Bank's proof of claim, the Court must also rule on this objection.

61

The Court finds that with respect to any objection that the Trustee has to the pre-petition amount claimed by Central Bank, the objection is overruled. The Court finds that with respect to the post-petition amounts claimed by Central Bank, the objection is sustained insofar as Central Bank is not entitled to recover any post-petition attorneys' fees or post-petition interest calculated at the default rate (although Central Bank is entitled to recover post-petition interest at the non-default rate).

Given this ruling, Central Bank must remit a check to the Estate for $15,446.62, representing the sum of $13,596.62 (which represents post-petition interest at the default rate which Central Bank collected without this Court's authorization) and $1,850.00 (which represents post-petition attorneys' fees incurred by Central Bank which it collected without this Court's authorization).

An order consistent with this Opinion will be entered on the docket simultaneously with the entry on the docket of this Opinion.

Signed on this 30th day of September, 2010.

Jeff Bohm
United States Bankruptcy Judge

TOW & KOENIG, PLLC
ATTORNEYS AT LAW
26219 OAK RIDGE DRIVE
THE WOODLANDS, TX  77380

Invoice submitted to:
JACK KLINE COMPANY, INC.-ASSET

EXHIBIT No. 

April 05, 2010

In Reference To:

Professional Services

|  |  |  | Hrs/Rate | Amount |
|---|---|---|---|---|
| 9/25/2009 - | JK | SPOKE TO AMANDA RE: PROPERTY FOR SALE; PULLED SCHEDULES; PULLED UCC-1 FILINGS FROM SOS DIRECT; REVIEWED CONTRACTS, ETC. DROPPED OFF BY AMANDA | 1.40 375.00/hr | 525.00 |
| 9/28/2009 - ▮ | | ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ | ▮▮▮ | ▮▮ |
| 9/30/2009 - | JK | DRAFT APPLICATION AND ORDER TO EMPLOY AMANDA ENRIQUE AS REALTOR; PDF & E-MAILED IT TO HER FOR APPROVAL | 1.10 375.00/hr | 412.50 |
| 10/2/2009 - ▮ | | ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ | ▮▮ | ▮▮ |
| - | N | MAIL OUT TRUSTEE'S APPLICATION TO EMPLOY AMANDA ENRIQUEZ, AGENT OF KELLER WILLIAMS REAL ESTATE AGENT & REQUEST FOR AUTHORIZATION TO PAY COMMISSION AT CLOSING | 0.46 50.00/hr | 23.00 |
| - | JK | MET WITH AMANDA & TRUSTEE RE: SALE OF PROPERTY & LIENS; PULLED COPIES OF ALL ABSTRACTS OF JUDGMENT, TAX LIENS, ETC., REVIEWED FOR CONSISTENCY WITH STATE LAW; OBTAINED PHONE NUMBERS FOR ALL COUNSEL; PREPARED SPREADSHEET OF ABSTRACTS; DISCUSSED WITH TRUSTEE | 3.40 375.00/hr | 1,275.00 |
| 10/21/2009 - | N | MAIL OUT   NOTICE OF HEARING  TRUSTEE'S APPLICATION TO EMPLOY AMANDA ENRIQUEZ | 0.46 50.00/hr | 23.00 |

Exhibit II

JACK KLINE COMPANY, INC.-ASSET



| | | | Hrs/Rate | Amount |
|---|---|---|---|---|
| 10/28/2009 | ▮ | ▮ | ▮ | ▮ |
| 10/29/2009 | ▮ | ▮ | ▮ | ▮ |
| | RDT | REVIEW OF EARNEST MONEY CONTRACTS | 1.42 375.00/hr | 532.50 |
| 10/30/2009 | ▮ | ▮ | ▮ | ▮ |
| 11/2/2009 | ▮ | ▮ | ▮ | |
| 11/3/2009 | ▮ | ▮ | ▮ | ▮ |
| 11/4/2009 | ▮ | ▮ | ▮ | ▮ |
| | N | MAIL OUT NOTICE OF CONTINUED HEARING | 0.40 50.00/hr | 20.00 |

Exhibit II

JACK KLINE COMPANY, INC.-ASSET



| Date | | Description | Hrs/Rate | Amount |
|---|---|---|---|---|
| 11/5/2009 | - | | | |
| 11/9/2009 | - RDT | DRAFT OF THE MOTION TO SELL. | 3.47<br>375.00/hr | 1,301.25 |
| 11/10/2009 | - RDT | DRAFT OF THE MOTION TO WITHDRAW APPLICATION TO EMPLOY.  CALL TO RICHARD.  LEFT MESSAGE.  DRAFT OF EMAIL TO RICHARD RE WITHDRAWAL OF APPLICATION. | 0.52<br>375.00/hr | 195.00 |
| | - N | MAIL OUT  MOTION TO APPOINT JACK KLINE AS DESIGNATED REPRESENTATIVE OF JACK KLINE CO.INC. & MOTION TO WITHDRAW TRUSTEE'S APPLICATION TO EMPLOY AMANDA ENRIQUEZ AS AGENT OF KELLER WILLIAMS REALTY AS REAL ESTATE AGENT | 1.14<br>50.00/hr | 57.00 |
| 11/16/2009 | - | | | |
| 11/23/2009 | - | | | |
| | - RDT | DRAFT OF THE MOTION TO SELL.  CALL TO MR. MERCURIO. | 0.88<br>375.00/hr | 330.00 |

Exhibit II

JACK KLINE COMPANY, INC.-ASSET                                                    Page    4

| | | | Hrs/Rate | Amount |
|---|---|---|---|---|
| 11/24/2009 - | ███ | ███████████████████████ | ███████ | ███████ |
| - | | | | |
| 11/30/2009 - | | | | |
| 12/4/2009 - | RDT | WORK ON THE MOTION TO SELL. | 1.52<br>375.00/hr | 570.00 |
| 12/8/2009 - | RDT | COMPLETION OF THE MOTION TO SELL.  EMAILS TO CREDITORS REGARDING THE MOTION TO SELL.  REVIEW OF THE APPLICATION TO EMPLOY AMANDA.  EMAIL TO AMANDA AND CHUCK REGARDING THE LEGAL DESCRIPTION. | 2.93<br>375.00/hr | 1,098.75 |
| 12/9/2009 - | SZ | PREPARED TO FILE & FILED TRUSTEE'S MOTION TO SELL PROPERTY | 0.40<br>60.00/hr | 24.00 |
| - | SZ | PREPARED TO FILE & FILED TRUSTEE'S MOTION TO SELL PROPERTY | 0.80<br>60.00/hr | 48.00 |
| - | ███ | ████████████████████████████ | ███████ | ███████ |
| - | RDT | FINAL REVIEW PRIOR TO FILING OF THE MOTION TO SELL. | 0.70<br>375.00/hr | 262.50 |
| 1/7/2010 - | ███ | █████████████████████████ | ███ | ███ |
| 1/14/2010 - | RDT | REVIEW OF OBJECTION TO MOTION TO SELL. PREPARATION FOR HEARING. | 1.52<br>375.00/hr | 570.00 |
| 1/15/2010 - | RDT | PREPARATION FOR HEARING ON MOTION TO SELL. | 5.95<br>375.00/hr | 2,231.25 |
| 1/16/2010 - | SZ | MAILED OUT A LETTER  FORM THE TRUSTEE TO SARA WOLKOWITZ & MICHAEL VALENTINE INCLUDING THE NOTICE OF HEARING ON TRUSTEE'S MOTION TO SELL PROPERTY & THE TRUSTEE'S MOTION TO SELL PROPERTY VIA CERTIFIED & REGULAR MAIL | 0.50<br>60.00/hr | 30.00 |
| 1/19/2010 - | RDT | CONTINUATION OF WORK TO PREPARE FOR THE HEARING ON THE MOTION TO SELL. | 4.45<br>375.00/hr | 1,668.75 |
| 1/20/2010 - | ███ | ██████████████████ | ███ | ███ |

Exhibit II

JACK KLINE COMPANY, INC.-ASSET

Page    5

| | | | Hrs/Rate | Amount |
|---|---|---|---|---|
| 1/21/2010 - | RDT | DRAFT OF THE SUBPOENA AND THE QUIT CLAIM DEED. | 1.34<br>375.00/hr | 502.50 |



| | | | Hrs/Rate | Amount |
|---|---|---|---|---|
| - | JK | DRAFT AGREED ORDER ON SALE; GAVE TO TRUSTEE TO REVIEW; E-MAILED EXHIBIT & WITNESS LIST & EXHIBITS TO RICHARD BATTAGLIA; ASKED SHIRLEY TO BREAK UP EXHIBIT E AND SEND IT TO RICHARD AS IT IS TOO LARGE | 1.70<br>375.00/hr | 637.50 |
| - | JK | WORK ON EXHIBITS, RENAMING, REVISE EXHIBIT LIST; REVIEW STIPULATIONS; DRAFT AGREED ORDER ON SALE | 5.20<br>375.00/hr | 1,950.00 |

Exhibit II

JACK KLINE COMPANY, INC.-ASSET

Page      6



|  |  |  | Hrs/Rate | Amount |
|---|---|---|---|---|
| 1/26/2010 - | ███████ | ████████████ | ████ | ███ |
| - | ███████ | ████████████ | ████ | ███ |
| - | RDT | PREPARATION OF THE WOLKOWITZ RESPONSE LETTER, STIPULATION, QUIT CLAIM DEED.  PREPARATION OF THE STIPULATION WITH R&R. | 2.16 375.00/hr | 810.00 |
| 1/27/2010 - | ███████████ | | ████ | ██ |
| ███████████ | | | ███ | ██ |
| - | ██████████ | | ███ | ██ |
| 1/28/2010 - | ██████████████ | | ████ | ████ |
| - | | | | |
| - | | | | |
| - | | | | |
| - | | | | |
| 1/29/2010 | JK | MET WITH TRUSTEE, RICHARD BATAGGLIA; ECT. RE: HEARING ON MOTION TO SELL; ATTEND HEARING | 3.00 375.00/hr | 1,125.00 |
| 2/11/2010 - | ██████████████ | | ████ | |
| 2/23/2010 - | | | | |

Exhibit II